THE BELGENLAND.

EVANS v. THE BELGENLAND.

*(District Court, S. D. New York.   October 4, 1888.)*

1. COLLISION—DAMAGES—LOSS OF CHARTER—SUBSEQUENT CHARTER AT LOWER RATES—WAGES OF CREW.
   If an existing charter is lost in consequence of a collision, and a charter at lower rates is necessarily taken for the residue of the charter period, the ship-owner is entitled to recover, as an item of his damage, the difference in value of the two charters up to the time of the expiration of the original charter; also for the crew, who are necessarily under pay on contract during the detention.

2. SAME—ADJUSTMENT OF COMPASSES.
   The readjustment of compasses, rendered necessary by putting new plates in an iron ship to repair injury done by collision, is an allowable item of the ship-owner's damage.

3. SAME—SHIP'S RATING AT LLOYD'S.
   The expense of a new rating of a vessel at Lloyd's is a proper item of the ship-owner's damage.

4. SAME—MASTER'S PROTEST.
   The expense of a master's protest, when made in a foreign port, is allowable as an item of the damage caused by collision.

In Admiralty.   On exceptions to commissioner's report.
*Butler, Stillman & Hubbard,* (*W. Mynderse,* of counsel,) for libelant.
*Biddle & Ward,* for claimants.

BROWN, J.   Upon the commissioner's report assessing the damages by collision, the chief exception is to the allowance of $1,540.97 for the loss of a charter, in addition to $4,815.65, allowed for 35 days' detention, while the vessel was undergoing repairs.   The collision occurred while the libelant's steamer, the Hartlepool, was on a voyage from England to Perth Amboy, N. J.   She was then under charter, agreeing, after de-

livery of her cargo at Perth Amboy, to proceed to Port Royal, S. C., for a cargo of phosphate rock, to be taken to Europe, and to be ready to load at Port Royal by the 5th of June. The repairs made necessary by the collision detained her 35 days in New York, and, as she was unable to reach Port Royal by June 5th, and as freights had fallen, the charterers canceled the charter, as they had a right to do under its provisions. The capacity of the steamer was about 2,110 tons; the charter rate, 15 shillings per ton. The length of the charter voyage, reckoning from the time of leaving Perth Amboy, would be 38 days. The steamer, when repaired, went to Chesholm island, near Port Royal, for a similar cargo, at 12 shillings per ton, which was the best that she could do. The sum of $4,815.65, allowed by the commissioner for 35 days' detention, is at the rate of $137.59 per day, or 6d. per ton, the rate of demurrage specified in the original charter. The item of $1,540.97 is for the difference of three shillings per ton between the two charters. I cannot sustain the allowance of both these items. The item for "demurrage" represents, or ought to represent, the full value of "the use of the vessel" for the first 35 days at charter rates. If it does so, that is all that the libelant is entitled to recover for that period; and the fact that 6d. per ton was all that the original charter required, would, if put in evidence as against the owners, be presumptive evidence that that was as much, at least, as the ship was worth during any such detention, even under the original charter rates. Beyond that, the most that the libelant could claim would be the difference of three shillings per ton on the freight for three days more, since that would reach to the time when the original charter voyage would have ended. The allowance of $1,540.97 in effect gives the owner the benefit of the original charter rates for 73 days from the time of arrival at Perth Amboy, instead of for 38 days; while the market rates for the last 35 days were three shillings lower. If the item of demurrage stands, only three thirty-eighths of the second item should therefore be allowed.

The rule of damages in collision cases is *restitutio ad integrum*. The owner is entitled to indemnity for the loss of the use of his vessel while repairing. The value of this use is to be determined according to the business in which she is engaged. If she is under charter at fixed rates, that is her business for the time being, and the charter rates, less the ship's expenses in earning them, *i. e.*, her net freights, furnish the rule of indemnity. Per NELSON, J., *Williamson* v. *Barrett*, 13 How. 110–112; *The Potomac*, 105 U. S. 631; *The Mayflower*, 1 Brown, Adm. 380–387. This mode of ascertaining the damages in such cases has long been applied in this court. If the detention is less than the whole charter period, the owner recovers, not the whole net freights, but for the proportionate period only. *The Gorgas*, 10 Ben. 666. If the existing charter is lost in consequence of the collision, and a charter at lower rates is necessarily taken for the residue of the charter period, the owner is entitled to compensation for this loss up to the expiration of the term of the original charter. He is entitled to this allowance, because he would not otherwise be indemnified for his actual loss, and because there is no legal rule

which precludes the recovery of his actual loss in such a case. The loss of the larger rate is the immediate consequence of the collision; and, the rate being fixed by the existing contract, this item of damage is not subject to the objection of being in the least uncertain, hypothetical, or speculative. The ship-owner is as plainly entitled to recover for such a loss as the cargo-owner for the loss of the market through the delay of the ship by negligence, or through collision. See *The Giulio*, 34 Fed. Rep. 911, and cases there cited; *The J. Nixon*, 2 Fed. Rep. 259. Compensation for difference in charter rates was allowed the ship-owner in the cases of *The Star of India*, 1 Prob. Div. 466, and *The Consett*, 5 Prob. Div. 229, which are quite like the present. No adjudications are cited to the contrary. See *The Lake*, 2 Wall. Jr. 52. The libelant is therefore entitled to compensation for the value of the use of the vessel during the 35 days' detention, computed upon the basis of her original charter rates, and also to the difference in her earnings for the three following days.

When the officers and men are under pay on contract, and cannot be otherwise profitably employed, the amount necessarily paid them during the ship's detention is also to be added, as one of the incidents of the damage. The libelant in this case gave no evidence to prove his damage by the method of showing the net freight that would have been earned. No evidence was offered of the expense of running the vessel, and only one witness was called to testify as to the value of her use. He states that $150 per day would be a fair and reasonable sum. Whether this is based upon the charter rates then existing, or upon the original charter rates, is not stated; but he says it has nothing to do with "profits." This sum is probably intended to include the expense of the ship and crew as she was then equipped. The rate of demurrage reserved in the original charter was 6d. per ton per day; in the second charter, 8d. per ton, *i. e.*, $137.50 and $181 per day, respectively. As the evidence of the charter rates, however, was objected to, and is not in this court held competent as against third persons, (*The J. A. Dumont*, 34 Fed. Rep. 428,) there is strictly no other competent proof before me on this point than the testimony of Mr. Spence, above referred to. The two items allowed by the commissioner amount to $6,356; which (deducting an allowance for the additional three days) is at the rate of about $170 per day for the 35 days. That the amount allowed, $6,356, is too much, is apparent from the fact that the gross freight under the original charter for 2,110 tons at 15 shillings per ton, for 38 days' service, would amount to only $7,738, *i. e.*, only $1,382 more than the amount of damages allowed. But $1,382 is obviously too little to cover the additional three days, (which must be deducted,) and the increased expense of the ship for coal and other charges while on the voyage, over and above the necessary expenses while lying at the dock. If the second charter rate had been 9 shillings instead of 12 shillings per ton, the same mode of computing the libelant's damages would have made them exceed the entire gross freights for 38 days, allowing nothing for the running expenses while on the voyage. Upon the evidence, as it stands, the demurrage must be

adjusted at the rate of $150 per day for 35 days; that sum, in the absence of other evidence, being taken to represent the actual value of the use of the vessel on the basis of her original charter rates, including such of the officers and crew as were attached to her while she was undergoing repairs; with a further allowance of $121.40 as three thirty-eighths of the difference between the rates of the two charters upon her cargo of 2,110 tons, for the loss on the remaining three days of the original charter period, amounting in all to $5,390. A few minor items were also excepted to.

1. *Adjustment of Compasses.* The testimony shows the liability to a change in the adjustment of the compass from putting new iron plates upon the ship. In this case 22 new plates were put upon the bows, not far from the compass. Reasonable precaution made the readjustment necessary, and this item of expense should therefore be allowed. The "overhauling" of the compass, so called, was not made necessary by the collision, and is therefore disallowed.

2. *Ship's Rating at Lloyd's.* It was conceded on the argument that a proper rating of the ship, and a certificate thereof, are necessary, in ordinary commercial dealings, to enable the ship to obtain employment at the market rates. The collision destroyed the rating she previously had, and therefore rendered a new rating necessary after she was repaired. The expense of this new rating was the direct result of the collision, and should therefore be allowed.

3. *Master's Protest.* The expense of a protest made in the home port as a mere means of collecting the insurance has been held in this court not recoverable, because insurance is a matter of contract wholly between the insurer and the insured, and is no part of the owner's interest in the ship. *The City of Norwich*, 118 U. S. 468, 6 Sup. Ct. Rep. 1150. But the master's protest, made in a foreign port, truthfully stating the details of any disaster to this vessel, is important in many ways to all interested. It is required by ancient, and, I think, almost universal, usage. Dana, Seaman's Manuel, 186; Abb. Shipp. *380; 1 Kay, Shipm. 253; Laws of Oleron, 14; Wisbuy, 55. The expense is small, and when made in foreign ports, as in this case, it should be allowed. The other exceptions are overruled.