## THE AMES & CARROLL NO. 20.

### THE EDWIN CHILTON.

#### No. 343.

Circuit Court of Appeals, Second Circuit.
July 17, 1933.

Courtland Palmer, of New York City, for claimant appellant.

Vincent A. O'Connor, of New York City, for libelants appellants.

Jacob Aronson, of New York City (K. O. Mott-Smith, of New York City, of counsel), for impleaded respondent appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The injuries sustained by the scow were caused by collision with the abutment of the south draw of the New York Central's drawbridge which spans the Harlem river near its junction with the Hudson at Spuyten Duyvil. The scow was light, and was being towed stern first on a bridle hawser of about 30 feet in length by the tug Edwin Chilton, bound from 207th street on the Harlem river to the Dyckman street dock on the Hudson river,

and thence to Kingston, N. Y. The accident occurred at about 1:30 a. m. on January 15, 1930. The night was dark, the weather slightly misty, and an ebb tide running strong. When the tug was about 2,000 feet away, she signaled the bridge to open. No answer was received, and, proceeding slowly, she again signaled and again received no answer. When about 1,000 feet distant and within sight of the bridge, she gave a third signal, to which the bridge tender responded with two blasts, indicating that the bridge would not open. Thereupon the tug rounded to and headed into the tide. About ten minutes later, after two trains had passed, the bridge tender signaled that the bridge would open. The tug then came around on a hard aport wheel, but was unable to get her tow straightened out in time to prevent the strong tide from carrying it into collision with the bridge abutment.

 The tug contends that the bridge was at fault in not giving timely warning that it would not open in response to the tug's earlier signals. Had it done so, the argument is, the tug would have rounded to at a greater distance from the bridge and would then have been able, when she again came around, to have got her tow in shape to proceed safely through the draw. Two answers may be made to this contention. In the first place, the commissioner found that there was no unjustifiable delay in opening the bridge, and that the bridge signaled its refusal to open in ample time to permit the tug to round to at a sufficient distance to enable her to shape up her tow for safe passage. There is support in the testimony for these findings of fact, and they should therefore be allowed to stand. In the second place, even if we should find that the bridge tender was negligent in not signaling his warning earlier, it would be impossible to find that such negligence was a cause of the collision. After his warning was given, the tug turned her tow and was safe; she was at liberty to do whatever prudence required to get her tow in shape later to enter the draw. Had she gone far enough back before turning again she would have been in as good position to straighten out her tow as if the warning signal had been given when she claims it should have been. Her master knew the conditions and the dangers, for earlier on that very night he had taken another scow through and brought her also into collision with the bridge abutment. With full knowledge of the conditions, to turn his tow at a place too near the bridge to enable him to straighten out was obviously negligent navigation. We cannot see how the tug can escape liability, or how the railroad company

can be held at fault. Upon the merits the decree was clearly right. Donovan v. N. Y. Central R. R. Co., 16 F.(2d) 611 (D. C. S. D. N. Y.); The Harlem River No. 1, 7 F.(2d) 119 (C. C. A. 2).

We pass now to the award of damages, of which both parties complain. The scow was chiefly damaged on the starboard side amidships; nine planks being broken. She was an edge-bolted scow, and had been constructed at a cost of $18,000 about two and a half years before. A survey was held on notice, and four bids for repairs in accordance with the survey were obtained, of which the lowest was $7,840. This was modified upon the hearings to $7,807, which is the amount now claimed by the libelants. The survey called for the removal of both deck planks and bottom planks in order properly to fasten the new side planks, but the commissioner found that, by removing the third and fourth strakes overlapping the sixth strake, the edge-bolting of the sixth strake could have been done from above, thus obviating the necessity of removing the bottom planks; and that this alternative method would have made the boat equally strong and would have resulted in a saving of $876. Accordingly he deducted this sum from the lowest bid and awarded the appellant $6,964 for repairs. In fact the repairs were not made either in full accordance with the survey method, or in accordance with that method as modified by the commissioner; instead edge-bolts were driven through deck and bottom planks. The actual cost of repairs was only $3,307. The claimant contends that the award for repairs should be limited to what they actually cost, with possibly an additional $1,400 for depreciation in value due to edge-bolting through deck and bottom; while the libelants claim they should have the amount of the lowest bid ($7,807), instead of the $6,964 allowed by the commissioner.

 There can be no doubt that the repairs actually made did not restore the scow to as good condition as before the collision. The owners are entitled to her restoration to that condition irrespective of the cost of the actual repairs. The B. F. Guinan, 40 F.(2d) 277 (D. C. E. D. N. Y.); The Elmer A. Keeler, 194 F. 339, 342 (C. C. A. 2); The Baltimore, 75 U. S. (8 Wall.) 377, 385, 19 L. Ed. 463. The lowest bid for doing the work required to restore her should have been accepted by the commissioner as evidence of the measure of the libelants' damages. The commissioner based his deduction therefrom of $876 upon Feeney's testimony that the

cost of removing twenty bottom planks, as called for by the survey, would be $1,200, and the cost of removal and renewal of two sound planks in the third and fourth strakes so as to edge-bolt the sixth strake from above, thus avoiding the removal of the bottom planks, would be $324. But this item of $324 was not testified to be the entire cost of the alternative method. This method might require the removal of additional deck planks in order to refasten the planks in the third and fourth strakes. Feeney said his figure of $324 "covers the removal and replacement; it does not include the removals of any other necessary plank in order to refasten." That would depend on how far the removed planks in the third and fourth strakes extended, and that, he said, "might possibly go so far as to take in the entire side." We think the saving by the alternative method was too indefinitely and vaguely proved to justify any deduction from the bid. Accordingly the amount allowed for repairs should be $7,807, as the libelants contend.

The remaining item in dispute relates to demurrage. The decree allowed $378 for demurrage, being at the rate of $14 per day for 27 days. The libelants claim demurrage up to March 7th; i. e., 51 days. At the time of the collision the scow No. 20 was under oral charter to the Ames & Carroll partnership to proceed to Kingston, load a cargo of brick, and upon return to New York hold the cargo until its sale and discharge. Two other scows under similar charter and in the tow for which the No. 20 was intended were finally discharged on February 24th and March 7th, respectively. The No. 20 would in ordinary course have been discharged after these two, but the libelants have stipulated to restrict their claim to March 7th. As the libelants had no idle scow to substitute for the No. 20 and as navigation on the Hudson was closed for the winter before the No. 20 could be repaired, they lost the benefit of their seasonal charter, and, when their boat was again fit for service, had no use for her until after March 7th. The charter rate was $14 per day, and the libelants claim for 51 days.

It is reasonably certain that this was their actual loss, and the court can cut it down only on the theory that the claimant was liable not for actual loss but for reasonably probable loss. But we see no reason why the wrongdoer should not take his chances that the boat was on a long engagement under a seasonal charter. It is true that when a vessel under charter is totally lost the damages are her value and pending freight. The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053. But,

as that opinion intimates, at page 421 of 166 U. S., 17 S. Ct. 610, 617, the rule is different in the case of injury. This seems well settled by English authorities. The Star of India, 1 P. D. 466; The Consett, 5 P. D. 229; The Argentino, 14 App. Cas. 519; Roscoe, Damages in Maritime Collisions, (2d Ed.) p. 93. In the federal courts the same rule has been stated or assumed in numerous cases. See The Belgenland, 36 F. 504, 505 (D. C. S. D. N. Y.); The North Star, 151 F. 168, 175 (C. C. A. 2); The Wolsum, 14 F.(2d) 371, 377 (C. C. A. 5); The Umbria, supra. Of course if the injured vessel obtains other employment after completion of repairs and within the original charter period, the demurrage is only for the difference in rates. The Belgenland, supra. But in the case at bar the freezing of the river removed any such possibility. Nor does the rule stated in Williamson v. Barrett, 54 U. S. (13 How.) 101, 111, 14 L. Ed. 68, as to absence of demand for employment, apply here since the No. 20 would have been employed until March 7th but for the collision. Accordingly demurrage of $714 should be allowed.

The decree is modified in accordance with the foregoing opinion, with costs of appeal to the libelants-appellants.