**MISSISSIPPI HIGHWAY COMMISSION, City of Natchez and Department of Highways, State of Louisiana, Libellants**

v.

**DIXILYN DRILLING CORPORATION and Crescent Towing & Salvage Company, Inc., Respondents.**

Civ. A. No. 871.

United States District Court
S. D. Mississippi, W. D.

Dec. 5, 1960.

C. L. Collins, Natchez, Miss., for plaintiffs.

Brunini, Everett, Grantham & Quin, Vicksburg, Miss., and Lemle & Kelleher, New Orleans, La., for Crescent Towing & Salvage Co.

Watkins & Eager, Jackson, Miss., and Royston, Rayzor & Cook, Houston, Tex., for Dixilyn Drilling Co.

MIZE, Chief Judge.

The libellants, on December 22, 1958, filed their libel in the District Court, seeking to recover damages in the amount of $41,363.24, which they had sustained when their bridge across the Mississippi River, located between Natchez and Vidalia had been struck by the off-shore drilling barge, Julie Ann. The accident occurred December 27, 1957. Libellants

averred that the defendants, Dixilyn Drilling Corporation and Crescent Towing & Salvage Company, Inc., were guilty of negligence that proximately caused the damages to the bridge. In March, 1959 Dixilyn Drilling Corporation, hereinafter referred to as Dixilyn, filed its answer denying negligence on its part, but admitted it had employees on board the rig who were in charge of raising and lowering the legs that will hereinafter be more particularly described, but denied the failure to lower the legs was any negligence on the part of Dixilyn. It averred that the fault was all on Crescent and that Crescent did not have sufficient power to stop movement of the off-shore drilling rig when it became apparent that the same could not pass under the bridge without one of its vertical legs colliding with the bridge, and further averred that Crescent failed to give the signal it should have given in time to lower the legs. In March, 1959 Crescent filed its answer and denied any negligence on its part and averred that the collision was due to the negligence of Dixilyn; averred that the rig was fully manned and controlled by a crew of specialists during the trip down the river; averred that Crescent did not have dominion or control over the maneuvering of the barge or the legs thereof and that the fault was entirely due to the crew of the Dixilyn. At the same time Crescent filed a petition under Rule 56 of Admiralty, 28 U.S.C.A. This petition was based on the contract between the parties for the performance of the service of towage. It attached thereto as exhibits two letters, one dated December 19 and one dated December 23, 1957, which it alleged constituted the agreement. The petition further alleged that under the terms of the contract Dixilyn had agreed (1) to indemnify Crescent for all damages which might arise out of the movement, including claims of third parties; and (2) to procure full insurance protection at its own expense against all risks, including damage to any bridge or structure, and such insurance to inure to the benefit of Crescent as well. Dixilyn answered the petition and denied that it had agreed to the indemnity provisions of the contract or to the provisions relative to the insurance, and denied that the Dixilyn crew had anything to do with the movement of the legs other than to raise or lower them as directed by the employees of Crescent; denied that its crew was in charge of the timing and mechanics of raising and lowering the legs or that there was any error on its part in reading or reporting the draft marks of the legs; and denied the interpretation that was placed on the contract by Crescent. On April 21, 1959 libellants answered the petition under Rule 56 of Admiralty and averred that one or both of the defendants were liable. After several pre-trials the defendants stipulated that the libellants were entitled to a judgment for the damages to the bridge against either one or both of the defendants. In March of 1960 the case came on for trial on its merits with reference to the contest between the defendants as to which one was liable.

The controversy grew out of a contract between Crescent and Dixilyn under the terms of which Crescent contracted to tow down the Mississippi River from Vicksburg to New Orleans, Louisiana, a large off-shore drilling barge or rig named the Julie Ann. It left Vicksburg, Mississippi on December 26, 1957 and as it undertook to pass under the bridge which crosses the Mississippi River at Natchez one of the legs on the rig had not been sufficiently lowered to pass under the bridge and it struck the bridge, doing damage to the amount of $41,363.24. This rig was gigantic in structure. She was 194 feet long, 152 feet wide and 20 feet deep, triangular in shape, with one movable leg at the bow and two at the stern. The legs were 175 feet long, with open truss steel frame construction. The lower ends contained pontoons or spud tanks 35 feet in diameter and 35 feet in overall height. The legs provided a tripod on which the platform could be raised or lowered at the rate of approximately one foot per minute. The draft of the hull was 13 feet. Beyond the main deck was a machinery deck containing a com-

plex lot of equipment and tanks necessary for power service and oil well drilling operations. On the main deck were located draw works, pipe racks, two revolving deck cranes, three anchor wenches and 2-story living quarters, atop which was a control tower. The rig was a complete unit. The living quarters were spacious, affording accommodations for 45 men, with year-round temperature control.

The defendant Crescent is a towing company, engaged in harbor, off-shore and ocean towing and tug work, and sometime in November of 1957 Crescent sought the business of towing the rig down the Mississippi River ultimately to its off-shore location. This solicitation was in the form of a letter dated December 18, 1957 from E. J. Pic, Jr., operating manager of Crescent, to Mr. Pickering of Dixilyn. Sometime between December 16 and 18, 1957 a meeting was held in the New Orleans office of Dixilyn, at which meeting there were present M. O. Boring, Jr., President of Dixilyn; Russell Tidwell, a petroleum engineer for Dixilyn; Charles D. Wood of Charles D. Wood Company, a marine surveyor representing Southern Marine and Aviation Underwriters Insurance, one of the excess coverage carriers for Dixilyn; H. W. Blakely of Charles D. Wood Company, a marine surveyor of Southern Marine and Aviation Underwriters, Inc.; Warren C. Apgar, Vice President of Crescent; and William S. Smith, Jr., also a Vice President of Crescent. The problem of transporting the Julie Ann from Vicksburg to New Orleans was discussed, and particularly the size of the rig, the length of the legs, the current, and the size and number of the tow boats that were to be used in the towage of the rig downstream. After various discussions it was found that John J. Brechtel, a Crescent employee and experienced river man and tugboat operator, engaged by Crescent and regularly employed by them, could be furnished, and Crescent agreed to place Captain John J. Brechtel in charge on its behalf before undertaking to tow the rig to its point of destination; that he would be in command of the tug

and all tows, and it was further agreed that Dixilyn would have an experienced man on the rig who would be in charge of lowering the legs of the rig when he was notified by Captain Brechtel that the legs should be lowered. At this meeting it was discussed as to the length of the legs that should be left off in order to reduce the force of the current on the rig and in the discussion the length of 60 feet was considered, but finally Mr. Brigham, who represented Dixilyn, advised that 30 feet already had been left off the legs and ultimately Crescent agreed that 30 feet left off would be sufficient. Apgar, representing Crescent, suggested that Crescent would require a clause in the towing agreement releasing Crescent from any and all liability in connection with the movement. Nothing definite was agreed on at this discussion, other than that Crescent would undertake the towage and would place in charge of it Captain Brechtel. The question of a clause in the towage agreement releasing Crescent of all liability was not determined at this meeting, but finally was agreed upon by correspondence after some negotiation and elimination of oral demands that were made by Crescent and the agreement ultimately was reduced to writing, as is shown by letters hereinafter to be referred to.

After that meeting another one was held on December 18 and 20, 1957 in the offices of Dixilyn, where representatives of each party were present, as well as representatives of Southern Marine & Aviation Underwriters. However, these representatives of the Underwriters were there simply as consultants and had no authority to bind anyone, and at this meeting the nature of the release clause was discussed, but no definite agreement reached. Giffin and Stentz requested Apgar to submit the type of release clause desired by Crescent and on December 19 Apgar wrote Dixilyn, to which was attached the standard towage release clause used by Crescent. Dixilyn declined to execute that and requested Apgar to submit another type. Brigham, who represented Dixilyn, was not present

when it arrived, so Tidwell, an authorized representative of Dixilyn, received it and upon its receipt called Giffin and Stentz of Southern Marine for their comments, and after talking to them declined to accept it, but asked that Apgar submit another clause for their approval. On December 23, 1957 Apgar wrote a letter setting out what they desired and this was received by Tidwell, who did not understand the full meaning of the letter and so again he called Giffin and Stentz and was advised by Giffin and Stentz that the letter was objectionable because the first sentence of the second paragraph was illegal and unenforceable. Tidwell then relayed this information to Apgar, who then called Giffin and Stentz to determine what he could further agree to. Giffin and Stentz told him they could not agree to that, but for them to submit another letter excluding the objectionable sentence and they would instruct Tidwell to sign it. Apgar then sent a third letter, dated also December 23, and upon its receipt by Tidwell he called Giffin and Stentz for advice. Giffin told him to sign the letter in that form, but that it was illegal and unenforceable, so his signing it would make no difference, and thereupon the second letter of December 23 was signed by Tidwell and copy returned to Crescent. Tidwell then went to Vicksburg to join the Julie Ann. The important part of the second letter of December 23, 1957 reads as follows:

"It is particularly understood and agreed that you are authorized to and by this agreement do release and relieve us from any liabilities for account of your underwriters and that any damage claims urged by third parties as well as any claim which may be urged by virtue of damage to the drilling rig in the course of the towage shall be for your account and account of your underwriters."

The first letter of December 23, 1957 contained this language:

"You agree to indemnify us, our tugs and equipment and all other parties taking part in the towage and their equipment and our and

their underwriters of and from any and all liability or claims which may arise out of the towage of the drilling barge."

This sentence was eliminated and does not constitute a part of the written agreement.

Crescent contends, among other things, that Dixilyn is estopped to deny liability under that agreement because Dixilyn knew that that part of the agreement was void and unenforceable. This contention of estoppel cannot be accepted because Dixilyn did nothing to mislead Crescent. The parties were dealing with each other at arms length and had received advice from their attorneys. The doctrine of estoppel therefore does not apply.

On December 24 Crescent's tug Orleans left the city of New Orleans for Vicksburg with Captain Shirer as pilot and Walter Puckett as relief pilot, Robert Ricord as engineer, a Mr. Gonzales as relief engineer, and an oiler. Fog delayed their arrival in Vicksburg for the appointed time for departure of the rig. About midnight of Christmas Day the 4,000 h. p. triple screw Toltec arrived at the LeTourneau plant in Vicksburg. She was in command of Captain Dellie Clark with Captain E. M. Mathes as pilot on the forward watch. About the same time the 1800 h. p. twin screw Ouachita, a riverboat from Vicksburg, reported at the LeTourneau plant. She was commanded by Captain W. W. Powell as master and Captain Louis O'Donnell as pilot. The Julie Ann was located in the river at the LeTourneau yard. Her hull was raised out of the water about 9 feet on her legs. On board were Tidwell, Charles Wood and Wayne B. Hughes, who had been resident engineer for Dixilyn during the construction of the rig and whose duty it was to lower and raise the legs when directed to do so by Captain Brechtel. On board also was Lloyd Cotton, a marine engineer in charge of customer relations between LeTourneau and Dixilyn and who was on board as advisor to Dixilyn only. Also on board were a number of Dixilyn em-

ployees and a number of electricians and welders employed by LeTourneau. These LeTourneau employees were doing additional work as the boat was to be towed down the river, but had no connection with the towing or maneuvering of the flotilla whatsoever. Captain Brechtel was the master and in complete charge of the flotilla and had authority over all of Crescent employees.

About 8:00 A.M. on December 26 the two tugboats made up to the Julie Ann, the Toltec to a steel bar across the drilling slot in the stern of the rig and the Ouachita to the Toltec's port side. Captain Brechtel missed connections and failed to arrive at 8 o'clock on December 26. However, Captain Clark, who is a competent tugboat operator, inquired of Hughes if Dixilyn was ready, received a reply that Dixilyn was ready, and thereupon these tugs started out from Vicksburg with the rig. Captain Brechtel was an experienced operator of tugboats on the river and had towed two other LeTourneau drilling rigs down the river prior to this time. The flotilla had no trouble during the voyage down the river until it anchored for the night a considerable distance above Natchez. Captain Brechtel knew the river, the currents and the dangerous spots, and it was his judgment upon which all of Crescent relied. He joined the flotilla before they left the next morning from the point where they had anchored for the night. Captain Louis O'Donnell of Crescent rode on top of the Julie Ann control tower and gave signal instructions to Captain Clark by a telephone communications system rigged between the Julie Ann and the pilot house on the Toltec. About 2:00 P.M. the flotilla was joined by the tug Orleans, which made up to the starboard side of the Toltec.

Down the river about 5¾ miles, upstream from Natchez, an electric power line crosses the river. The lowest part of the line was approximately 108 feet above the surface of the river and the depth of the river at that point was 41 feet. At this point the tow was turned around and headed upstream to test the ability of the towing vessels to stop the rig. The legs were lowered approximately 35 feet and the power supplied by the Toltec, the Ouachita and the Orleans was sufficient to hold the tow. The power of the Toltec was then reduced to allow the Julie Ann to drift under the power line with the draft of 35 to 45 feet on her legs. After this maneuver the flotilla was moored for the night at a point known as Rifle Point and it was at this place that Captain Brechtel joined the flotilla. No difficulty was encountered from Vicksburg to this point, but care was exercised in coming under the power lines. Captain Brechtel had come by taxi to Natchez and at Natchez he joined Captain Harry Wilson, who was in charge of the United States Engineers' boat, the Orleans, and that boat proceeded to Rifle Point with Brechtel and there Captain Brechtel boarded the flotilla. Captain Wilson had informed Captain Brechtel of the various depths of the channel from a point immediately in front of the Natchez bridge upstream for a distance of two miles or more. Upon arriving at the flotilla, Brechtel went aboard his tug, the Orleans, to assist in mooring and then went on the Julie Ann. After a discussion of the conditions of the river, depth of the water, the dangers of the currents and the location of the rock ledge, known only to Captain Brechtel, he (Brechtel) determined that 55 feet draft on the legs would be sufficient to clear the rig through the Natchez bridge. The lowest part of the rig was 142.9 feet above mean sea level and Captain Brechtel determined that there was a channel well in excess of 60 feet in depth, approximately 1000 feet wide, extending from Natchez bridge upstream a distance of more than two miles.

About 7:00 A.M. the flotilla was somewhere in the neighborhood of Learned's Mill, about 1¼ miles above the Natchez bridge. The rig was turned around and headed upstream and the legs were lowered to a draft of 35 feet. At this point a test was made of the holding power of the tugs against the tows and in the opinion of Captain Brechtel, with the legs lowered 35 feet the tugs would hold. No test.

was made at this point, or at any other point, to determine the holding power of the tugs with the legs lowered to a depth of 55 feet, which was required in order to pass under the bridge. Without making a test to a depth of 55 feet, Captain Brechtel, in charge, permitted the flotilla to drift downstream toward the bridge before giving orders or notice to depress the legs. Captain Brechtel, with his knowledge of the river, knew that there was a submarine cable crossing the river about 2,500 feet above the bridge and about 1,500 or 2,000 feet above it there was a rock ledge that made out from the Mississippi shore. He knew that under the bridge there was a right hand set or right hand draft in the current away from the Mississippi bank toward a bridge pier on the West side of the navigation span. He knew this condition of the current had a tendency to force boats into that pier. Without making any further tests, he maneuvered the flotilla toward the Mississippi bank across the rock ledge, and at no time did he bring the flotilla to a stop after having crossed the ledge to give any signal to Hughes when to begin to lower the legs. He failed to stop the flotilla after he crossed the dangerous and hazardous rock ledge for Hughes to lower the legs 55 feet and neglected to give Hughes notice when to begin lowering the legs, as he had agreed to do and upon which assurance Hughes relied, and it was Hughes who discovered for himself that a leg was going to strike the bridge. As the legs were lowered the power of the current was too great for the tugs even to stop the barge, or even slow it down, until Hughes could lower the legs to the necessary depth. The engine on one of the boats was defective and not sufficient to put forth its full power, but even if it had put forth its full power, still the power of all the tugs would have been insufficient to hold the boat with the legs lowered to a depth of 55 feet. When it was made apparent to Brechtel that the flotilla would not clear, he ordered all boats full speed ahead, but was unable to stop the flotilla or slow it down in time

for the legs to be sufficiently lowered. Brechtel contended that Hughes miscalled the reading of the depth of the legs, but I am unable to find from all the testimony in this case that he relied upon such reading or that he had any reason or justification to rely upon same, as the function of Hughes on the Julie Ann, and only function in so far as the towage was concerned, was to lower or raise the legs when directed so to do by Brechtel. Hughes knew nothing about maneuvering the flotilla and knew nothing about the currents or the danger spots in the river, but insofar as maneuvering a tow down the river, the flotilla was entirely in charge of Captain Brechtel. The two itself had no power, but was controlled entirely by the movements of the tugs and the power afforded by the tugs, all of which were under the command of Captain Brechtel. As the flotilla was proceeding under the bridge and Mr. Hughes discovered that it would probably not pass under the bridge unless the tow was slowed down, he began immediately, as soon as he discovered the perilous situation, to lower the legs as rapidly as could be done. He was guilty of no negligence or carelessness in failing to begin lowering the legs earlier for the reason that he did not know where the rock ledge was and was depending on Captain Brechtel to advise him when to lower the legs. He continued to lower the legs as rapidly as the power afforded under the mechanism would permit him to do. The mechanism and the construction of the legs provide no way by which the lowering can be speeded.

The Julie Ann, with all of the drilling equipment and paraphernalia on board, probably weighed several hundreds of tons and it was known to Crescent that towing her down the river would be a very hazardous undertaking. She was a special craft, requiring special skill, management and control. On the voyage down the river Crescent knew that there were some three or four bridges under which she would have to pass. Crescent knew the location of utility lines and pipes which traversed the river and it

could be foreseen, or should have been foreseen that unusual care and caution in the undertaking should be exercised. Not to have seen and anticipated this condition of itself would be negligence on the part of Crescent. The task required an unusual and extraordinary amount of power to safely maneuver it. The obligation rested upon Crescent to navigate the flotilla with reasonable care, depending upon that degree of care commensurate with the hazardousness of the undertaking. The Julie Ann had no power of its own and no one on board who was expected or, under the contract, required to do any of the maneuvering or perform any other function other than to lower the legs or raise the legs when ordered so to do. Crescent owed the duty to third parties to exercise reasonable care in navigating this flotilla down the river commensurate with the unusual and extraordinary circumstances that confronted it. Captain Brechtel realized that it was a very hazardous undertaking to pass under the bridge and did turn around and place the tugs downstream to the Julie Ann so as to push against her upstream in order to have more holding power. However, Crescent had neglected to furnish sufficient tugs or sufficiently powerful tugs to control and maneuver the barge and her equipment.

Under all the testimony in this case Crescent was negligent in not furnishing sufficient power to hold the Julie Ann against the current when its legs were being extended to the required depth of 55 feet. The Crescent had had experience in towing heavy tugs and also had experience in towing two flotillas similar to the one that was being towed on this particular occasion, and it should have known the dangers attendant upon an undertaking like this and should have supplied additional tugs or tugs with more power than the combined power of these tugs. The tug Orleans was unable to exert its full power because of a defective engine which failed at the crucial moment. In reaching this conclusion I am not taking into consideration the testimony that when they reached the Baton Rouge bridge Crescent supplied an additional tug for the purpose of safely navigating under that bridge. I excluded this from consideration because it is something that happened after the occurrence at the Natchez bridge, but after excluding this testimony I find that Crescent knew or should have known that the power was insufficient. Captain Brechtel, who was in complete charge and control of the flotilla, was also guilty of negligence in not completely stopping the flotilla and lowering the legs to a depth of 55 feet before it reached the Natchez bridge. He knew that the current was running 4 or 5 miles an hour and knew that when the spuds were lowered to 55 feet it would be very difficult to control the flotilla because of the increased power of the current propelling the flotilla downstream and should have taken precautions to have had the legs lowered in ample time to have passed under the bridge safely. He was negligent in not making a test of the holding power of the barges with the legs lowered 55 feet when he was some two or three miles upstream from the bridge. He was negligent in his failure to notify Hughes earlier when to lower the legs and in not stopping immediately after he crossed the rock ledge in order for Hughes to have lowered the legs to a depth of 55 feet. Hughes exercised reasonable care when he began to lower the legs as soon as he saw and appreciated the danger confronting him and was guilty of no negligence that in any way contributed to the collision.

■ Under these facts, as a matter of law, the Crescent is liable for all the damages. Many authorities could be cited to sustain this view, but sufficient is the case of The Ames & Carroll No. 20 (The Edwin Chilton), 2 Cir., 66 F.2d 413; The Clarence P. Howland, 2 Cir., 16 F.2d 25.

■ The second question presented by this record for determination is whether or not the Dixilyn agreed to indemnify Crescent for any and all damages that might be suffered by third parties and, as

heretofore stated, Crescent relies upon the second letter of December 23. The evidence and correspondence is clear to the effect that Dixilyn declined so to do and declined to execute the towage release clause requested by Crescent. Crescent, of course, knew before the refusal of Dixilyn to execute those documents that Dixilyn did not intend to release Crescent from any liability to third parties due to the negligence of Crescent. In order for one to release the other party for damages due to its own negligence, the contract of indemnity must be clear and definite in its terms that such is the intention. Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir., 257 F.2d 410; Standard Oil Co. of Texas v. Wampler, 5 Cir., 218 F.2d 768; Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911.

Since the damages to the bridge flowed from the negligence of Crescent, it is clear under the above authorities that Dixilyn did not indemnify or agree to indemnify Crescent by its letter of December 23. Southwestern Sugar & Molasses Co. v. River Terminal Corp., 360 U. S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, is not in conflict with Bisso and in no way overturns the holding in the Bisso case. All the authorities cited by Crescent have been given careful study, but are not applicable to the facts of the present case and it would unduly prolong the length of this opinion to undertake to differentiate them. The authorities that have been cited hereinabove are con-upon the legal issues presented. The facts as herein stated and the law as herein declared constitute my finding of fact and conclusion of law.

Libellants in the case are entitled to a judgment in the sum of $41,363.24 against the Crescent Towing & Salvage Company, Inc., and the liability of the Crescent Towing & Salvage Company, Inc., is established for that amount. The cross-bill of Crescent Towing & Salvage Company will be dismissed.