CRESCENT TOWING & SALVAGE COMPANY, Appellant,

v.

DIXILYN DRILLING CORPORATION, Appellee.

No. 19148.

United States Court of Appeals Fifth Circuit.

May 9, 1962.

B. H. Quin, Vicksburg, Miss., Charles Kohlmeyer, Jr., New Orleans, La., Lemle & Kelleher, New Orleans, La., Brunini, Everett, Grantham & Quin, Vicksburg, Miss., of counsel, for appellant.

E. D. Vickery, Houston, Tex., Royston, Rayzor & Cook, Houston, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The appellant (Crescent) and the appellee (Dixilyn) were respondents to a libel filed by the Mississippi State Highway Commission, the City of Natchez, and the Highway Department of the State of Louisiana for $41,363.24 damages sustained by the Natchez-Vidalia Bridge when Dixilyn's Julie Ann, an offshore drilling barge, collided with the underside of the bridge. The Julie Ann was being towed down the Mississippi River by Crescent pursuant to its contract with Dixilyn. Crescent and Dixilyn jointly paid the amount of the libelants' claim under a stipulation approved by the court, which provided in part that "the libelees, as between themselves, may litigate to a final conclusion all questions of negligence, liability, contribution, indemnity and ultimate responsibility on the part of each or both of the libelees." After a full trial on the merits, the district court entered a final decree holding Crescent solely at fault and liable to repay to Dixilyn its half of the satisfied claim with interest and costs.[1]

The district court found Crescent at fault for not furnishing enough power to hold the Julie Ann while her legs were lowered sufficiently to clear the underside of the bridge, and that Crescent's Tug Orleans had an engine failure which caused or contributed to the lack of sufficient power. It further found that Crescent's Captain Brechtel was guilty of negligence in failing to make an earlier test of the holding power of the tugs with the legs lowered to the required depth, in not causing the Julie Ann to be brought to a complete stop for the lowering of her legs, and in failing to notify Dixilyn's employee Hughes at an earlier time to start the lowering of the legs. Those findings are vigorously attacked by Crescent as clearly erroneous, and Crescent insists that the collision was caused by a misunderstanding of the

---

1. The opinion of the district court is reported as Mississippi Highway Commission et al. v. Dixilyn Drilling Corporation et al., S.D.Miss., 198 F.Supp. 788.

Dixilyn personnel aboard Julie Ann as to the operation of her legs, and by their failure properly to call the draft of the legs, thereby leading Captain Brechtel to the belief that the legs would clear the underside of the bridge.

A review of the district court's findings of fact would confront us with an extremely difficult decision. Instead, we examine first the towage contract between Dixilyn and Crescent. If that contract validly shifted liability for the collision damages to Dixilyn or its insurer, whether or not Crescent was negligent, the fact findings as to negligence are immaterial.

The facts necessary for our consideration of the towage contract are not in substantial dispute, and are restated largely from the briefs of the parties.

The Julie Ann, constructed at the LeTourneau plant at Vicksburg, is a self-contained, submersible type drilling rig. She is 193 feet long, 151 feet wide, and has a displacement of 2500 tons. She is triangular in shape, with legs of open truss steel frame construction 175 feet long set on each corner of the triangle. Approximately 30 feet of the legs had not been installed at the time of the collision. The lower end of each leg consists of spud tanks or feet 35 feet in diameter and about 35 feet in height. The legs provide a tripod on which the hull of the barge can be raised or lowered for drilling operations or for navigational purposes. The legs are operated from a control room situated above the quarters. They are lowered and retracted by three 60 cycle motors powered by three generators, any one of which is capable of lowering or retracting all three legs simultaneously. The legs are controlled by three levers, all of which can be manipulated so that each leg can be raised or lowered by itself or with one or both of the other legs.

The barge hull itself is 20 feet in depth (from main deck to bottom), and at the time of the collision the hull afloat was drawing approximately 13 feet. Below the main deck is a machinery deck containing a complex of equipment and tanks necessary for drilling operations, including mud tanks, water tanks, and fuel tanks. On the main deck are located draw works, pipe racks and anchor winches. Two story living quarters are situated above the main deck, completely equipped as spacious and comfortable accommodations for 45 men, all air-conditioned and equipped with a modern galley, laundry and recreation lounge. The rig is a complete self-contained unit, capable of drilling in more than 100 feet of water, and includes in her equipment slush pumps, a Schlumberger unit, cement unit, mud lab, water evaporator, mud pits and mixers, jets and guns, six diesel engines, and six electric generators.

The Natchez-Vidalia bridge is a fixed highway bridge over the Mississippi River. The lowest member of the bridge is 142.9 feet above mean sea level. The surface of the river at the bridge is 17.28 feet above mean sea level at zero on the Natchez gauge. On December 27, 1957, the date of the collision, the Natchez gauge reading was 33.2 feet, so that there was a clearance of 92.4 feet between the surface of the water and the lowest steel on the bottom side of the bridge. The legs of the rig being 143 feet long, they had to be lowered so that at least 51 feet were below the water in order for the rig safely to clear under the bridge. The legs could not be lowered to a depth that would cause them to foul on the river bottom during the approach to the bridge.

The channel of the river (the deepest portion, in which safe navigation is afforded) approaching the bridge is no less than 1200 feet wide for a substantial distance above it. The contour of the bottom, however, is not level a short distance above the bridge, there being a ledge or bar less than 55 feet below the surface about 2500 feet above the bridge. Accordingly, until the flotilla passed that point, it was impractical for the legs to have been lowered more than 35 feet. All of these facts were generally known, although, of course, the exact level of the water and the exact conditions which would be encountered on the day that

the proposed movement would take place could not be foreseen in advance.

The Julie Ann was scheduled for departure from the builder's yard at Vicksburg for the day after Christmas. Upon hearing that the rig was nearing completion, Crescent solicited the business of towing her to New Orleans, and a letter of solicitation was written. Whether due to this solicitation or otherwise, Dixilyn contacted Crescent in mid-December and suggested a meeting to negotiate a towage contract. A meeting was held at Dixilyn's office in New Orleans in mid-December, attended by Messrs. Tidwell, Boring and Brigham, corporate officers of Dixilyn, Messrs. Wood and Blakely, whose capacity will be hereafter adverted to, and Messrs. Apgar, Smith and Lanman of Crescent. (Mr. Lanman died prior to the trial.) At this meeting, there was a discussion of the general characteristics of the rig and of the timing of the movement, and it was tentatively agreed that Crescent would undertake the towage. Mr. Wood specified that he desired Captain Brechtel to be in charge of the tow, because he had brought one or more rigs down the river on prior occasions. Crescent stated that it proposed to use Captain Brechtel with its small Tug Orleans and two upriver push boats, the Toltec and the Ouachita, if those vessels were available. The navigation of the flotilla was to be under the command of Crescent's pilot, Captain Brechtel.

The Toltec is a triple screw, 3975 horsepower push boat, 130 feet long by 30 feet wide. It was only six months old at the time of the collision and was the sixth most powerful towboat then running on the Mississippi River. The Ouachita is a twin screw, 1800 horsepower push boat, 90 feet long by 26 feet wide. The Orleans is a single screw tug of 700 horsepower, 100 feet long by 26 feet wide.

The exact role of Mr. Wood does not appear by the evidence. Mr. Wood died before the case was tried, and Mr. Blakely was not called to testify. Wood, however, was the president and owner of a marine surveying company in New Orleans and had had substantial experience in the engineering and moving of submersible drilling rigs comparable to Julie Ann. Blakely was one of his staff. Evidently they represented Dixilyn in this instance, or Dixilyn's underwriters, for they were at the meeting and participated in the conference and did not represent or have any connection with Crescent.

The district court found that the question of a provision in the towage agreement releasing Crescent of all liability was not determined at that meeting, and that nothing definite was agreed on other than that Crescent would undertake the towage and would place it in charge of Captain Brechtel.

Following the discussion at the meeting, Crescent's vice president, Mr. Apgar, after consulting with its admiralty counsel, Mr. Kohlmeyer, wrote a letter to Dixilyn as follows:

"December 19, 1957

"Dixilyn Drilling Corp.
Saratoga Building
New Orleans, Louisiana.
"Attention: Mr. H. Brighan
  Executive Vice President
    "Subj: 'JULIE ANN' From
      Vicksburg
      December 26th, 1957

"Gentlemen:

"We wish to confirm our recent conversation including Mr. M. O. Boring, Jr. and Mr. Mike Smith, in which we discussed the towing of the 'JULIE ANN' from Vicksburg to our Fleet Landing in the New Orleans harbor.

"We understand that the 'JULIE ANN' will be ready to leave Vicksburg the morning of December 26th and we expect to be in Vicksburg ready to move her at that time; we contemplate using two river pushboats (towboats) of substantial horsepower and one tugboat. For the trip from New Orleans to her offshore location, seagoing tugboats will be used.

"This tow will be performed by Crescent subject to towage release clause,

copy of which is attached and is part of our agreement with you; it being mutually understood and agreed that in consideration of including this clause lower rates prevail. It is also necessary that we (Crescent Towing & Salvage Co., Inc.) be included in the 'JULIE ANN' hull and P & I Insurance coverage and we will appreciate receiving a letter or telegram from your underwriters or brokers to this effect as soon as possible.

"We will continue to keep in touch with your office and know that you will advise us if there is any change in the anticipated readiness of the rig at Vicksburg. We appreciate very much your calling upon us to tow the 'JULIE ANN.'

"Very truly yours,

"CRESCENT TOWING & SALVAGE CO., INC.

"By /s/ Warren C. Apgar

"VICE PRESIDENT.

WCA:m

Encl. (1)

cc - Mr. Pic

Rate files

## "TOWER'S RELEASE CLAUSE

"All towage will be performed solely at the risk of the craft towed and its cargo, including the risk of negligence of the master, pilot and crew of the towing craft and our employees, agents and representatives, all of whom in respect to the towage shall become and be the servants of the craft towed and its owners and operators; provided that nothing herein contained shall be construed as making the craft towed, its owners or operators, liable or responsible for loss of or damage to the towing craft or property owned by third parties or for loss of life or personal injury for which the craft towed, its owners or operators, would not otherwise be liable or responsible. Neither we nor the towing craft nor its owners or operators shall be liable, and the craft towed and its owners and operators shall hold us and the towing craft and its owners and operators harmless from any liability, for any loss of or damage to the craft towed and its cargo from any cause whatsoever, including loss or damage caused by negligence of the master, pilot and crew of the towing craft and our employees, agents and representative. We reserve the right to tow all vessels singly or with other craft and to change craft towed from one to another tow as frequently as we may find it convenient to do so. Release of craft to be towed to any vessel owned or used by us for towage shall be conclusive evidence of the acceptance of these conditions."

The letter was referred by Dixilyn to representatives of the underwriters of the barge, and they were dissatisfied with the "Tower's Release Clause." Mr. Tidwell of Dixilyn called Mr. Apgar of Crescent and told him simply that the clause was not acceptable. Crescent submitted to Dixilyn a second letter, one sentence of which, as indicated, was found objectionable:

"December 23, 1957

"Dixilyn Drilling Corporation

Saratoga Building

New Orleans, Louisiana.

"Gentlemen:

"With further reference to our undertaking to tow your drilling barge JULIE ANN from Vicksburg to our Fleet Landing in New Orleans and then down the Mississippi River into the Gulf, we confirm that the following additional clause shall be included in the contract as part of the consideration for our undertaking the towage:

"~~You agree to indemnify us, our tugs and equipment and all other parties taking part in the towage and their equipment and our and their underwriters of and from any and all liability or claims which may arise out of the towage of the drilling barge.~~ It is particularly understood and agreed that you are authorized to and by this agreement do release and relieve us from any liability for account of your underwriters and that any damage claims urged by third parties as well as any claim which may be urged by virtue of damage to the drilling rig in the course of the towage shall be for your account and account of your underwriters.

"It is further understood that the amount of the insurance protection which you have in force equals the value of the hull of the barge as to hull insurance and amounts to four million dollars as to third party claims.

"If the foregoing meets with your approval and represents this portion of our agreement, please sign and return to us the attached three copies of this letter, retaining the original and the other copy for your files.

"Very truly yours,

"CRESCENT TOWING & SALVAGE CO., INC.

"BY /s/ Warren C. Apgar

"VICE PRESIDENT.

WCA:m

"APPROVED:

"Dixilyn Drilling Corporation

By: ——————— (NOT SIGNED.)"

The circumstances under which the letter was redrafted with the objectionable clause omitted are thus stated in the testimony of Mr. Tidwell of Dixilyn:

"Well, when I received the letter, I didn't understand it, so I had been advised and been discussing the matter with Mr. Giffin and Mr. Stentz, who are with Southern Marine and Aviation Underwriters, so I called them when I received this letter and read it to them on the phone and asked them if it was all right for me to sign it or normal procedure for me to sign it. So they had me to read it again and studied it and talked about it. So there was one sentence in there they said they wouldn't like to sign at all with that sentence in it.

\*   \*   \*   \*   \*   \*

"They said they wouldn't like for me to sign that letter at all with that one sentence in it and said, in fact, all the letter was objectionable, that they wouldn't like for me to sign it at all, but I could go ahead and sign it with that one sentence if it was stricken out, and said even though the rest of the letter—'We don't like it; it's been proven that it's not legal by a prior case in court; that it's not a legal document, but if they insist on you signing it, it will be all right to go ahead but we don't like it, but you can sign the rest of it.' So I called Mr. Apgar and told him I couldn't sign it at all with that one sentence in it; that I would sign it if they would strike that sentence out. So he said, 'Well, we'll re-write the letter verbatim, just leaving out that sentence.' And he wanted to know if I would sign it if they would do that. He did; sent me another letter, and I called Mr. Giffin and Stentz and read that letter to them and told them it was exactly the same except that one sentence was left out, and they advised me to go ahead and sign it. That is why I signed it, on their advice, because I felt like I needed some help because I didn't understand it. But I did sign it, not understanding, on their advice."

As indicated, the letter was redrafted with the objectionable sentence omitted and, as thus redrafted, was signed by Mr. Apgar for Crescent and by Mr. Tidwell for Dixilyn.[2]

As to whether the towage contract should be construed to shift to Dixilyn liability for collision damages in any event, including damages due to negligence of Crescent, the district court held:

"The second question presented by this record for determination is whether or not the Dixilyn agreed to indemnify Crescent for any and all damages that might be suffered by third parties and, as heretofore stated, Crescent relies upon the second letter of December 23. The evidence and correspondence is clear to the effect that Dixilyn declined so to do and declined to execute the towage release clause requested by Crescent. Crescent, of course, knew before the refusal of Dixilyn to execute those documents that Dixilyn

---

2. The consideration and other details were agreed upon verbally.

did not intend to release Crescent from any liability to third parties due to the negligence of Crescent. In order for one to release the other party for damages due to its own negligence, the contract of indemnity must be clear and definite in its terms that such is the intention. * * *

"Since the damages to the bridge flowed from the negligence of Crescent, it is clear under the above authorities that Dixilyn did not indemnify or agree to indemnify Crescent by its letter of December 23."

We have re-stated all of the evidence in the record which would support the district court's finding as to the intent of Dixilyn and as to Crescent's knowledge or notice of that intent. Mr. Tidwell signed the letter contract on behalf of Dixilyn in reliance upon advice from Giffin and Stentz, the underwriter's representatives. That advice was not communicated to Crescent, nor was Crescent advised of the reasoning or intention upon which that advice was based. Actually the advice which Giffin and Stentz gave Tidwell recognized that the meaning and intent of the contract were unfavorable to Dixilyn, but expressed the view that the contract was illegal. "We don't like it; it's been proven that it's not legal by a prior case in court; that it's not a legal document, but if they insist on you signing it, it will be all right to go ahead but we don't like it, but you can sign the rest of it."

Dixilyn's rejection of the Tower's Release Clause attached to Crescent's letter of December 19 and its rejection of the sentence stricken from Crescent's first letter of December 23 are not necessarily inconsistent with an intent on the part of Dixilyn to release Crescent from any liability to third parties due to the negligence of Crescent. To the contrary, Dixilyn's refusal to accept the Tower's Release Clause and its insistence on eliminating the sentence from the letter may have been because Dixilyn was not willing to accept liability, (1) for fault and negligence on the part of Toltec and Ouachita and their owners, and (2) for collision damages occasioned by Crescent's tug Orleans on its voyage up river to pick up the Julie Ann. If the second letter of December 23 which Dixilyn approved as a part of the agreement of towage expressed plainly and unequivocally that Dixilyn accepted liability for any damage claims of third parties, including those caused by Crescent's negligence, or that Crescent was to have the benefit of Dixilyn's insurance, then the intention so expressed is not inconsistent with Dixilyn's earlier rejections of the Tower's Release Clause and of the sentence stricken from Crescent's first letter of December 23. On the other hand, if that letter is doubtful or ambiguous, then we should place ourselves as nearly as possible in the situation of the parties and should consider the language of the agreement in the light of the previous meeting and correspondence and of all of the attendant and surrounding circumstances. Compare Restatement of Contracts, Sections 230–235.

"The cardinal rule of interpretation of indemnity contracts is the same as in the case of other types of contracts, namely, the ascertainment of the intention of the parties." Annotation 175 A.L.R. 29.

This Court has held in many cases that the failure of an indemnity contract to refer expressly to negligence evidences an intention not to indemnify against losses resulting from the indemnitee's negligence.[3]

In two cases where the contract did expressly refer to negligence, it was held

3. Southern Bell Telephone & Tel. Co. v. Mayor & Aldermen of Meridian, 5 Cir., 1935, 74 F.2d 983, 986; Halliburton Oil Well Co. v. Paulk, 5 Cir., 1950, 180 F. 2d 79, 84; Martin v. American Optical Co., 5 Cir., 1950, 184 F.2d 528, 529; W. C. Shepherd Co. v. Royal Indemnity Co., 5 Cir., 1951, 192 F.2d 710, 717; Standard Oil Co. v. Wampler, 5 Cir., 1955, 218 F.2d 768, 770; Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir., 1958, 257 F.2d 410, 412, et seq.

to provide indemnity for losses resulting from the indemnitee's negligence.[4]

The more recent case of Batson-Cook Co. v. Industrial Steel Erectors, cited in note 3, supra, while holding against the indemnitee, did so both because of failure to use the "talismanic words," and also because of inability "to find the equivalent clear intent in other language of the agreement." 257 F.2d at 412. Finally, our most recent opinion on the subject expressed the view that the rule requiring that, in order to relieve the indemnitee from liability for losses caused by his own negligence, the contract must contain an express stipulation to that effect "rests on an unsound and dangerous foundation" for reasons well stated by Chief Judge Tuttle:

> "It presumes, first of all, that one party's assumption of liability for losses due to another's negligence is an 'unusual' and 'hazardous' undertaking. We cannot agree. In the light of modern conditions, we perceive little justification for so characterizing the indemnitor's obligation. Insurance companies assume this obligation every day, especially in connection with automobile liability policies. And, it is common knowledge that the device of insuring against one's own negligence through indemnity contracts is frequently employed in other business ventures.

> "Perhaps more important, even assuming that the burden imposed on the indemnitor is 'unusual' or 'hazardous', the majority rule presumes that courts have the power to alleviate or eliminate this burden by construing the indemnity agreement in a manner which is patently inconsistent with the plain and clear meaning of the language employed by the contracting parties. This is a dangerous and unwarranted extension of the judicial function. If a court feels that a contract imposes an extraordinary liability on one of the parties, it may, in certain instances, pronounce the contract void as being contrary to public policy. But where, as here, a contract does not violate public policy, we have no authority to achieve the same result by concluding that the parties did not really mean what the unambiguous language of their agreement imports." Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1962, 296 F.2d 256, 262, 263.[5]

Thus the strict rule so frequently expressed in the cases appears to be giving way somewhat to the modern practice of providing liability insurance, and of bargaining as to which party shall bear the expense of such insurance. According to Mr. Apgar's testimony that expense was large; recently, in towing another drilling rig, Crescent had been charged one per cent of the value of the craft to be towed as a premium to protect for the one trip against liability for any damages. If Crescent had assumed that expense, it would have been reflected in its charge for towage. Actually, the rate charged on the Tug Orleans was $35.00 an hour, which Mr. Apgar testified was the customary charge for a normal operation with the Orleans.[6]

■ The letter contract plainly stated that the "additional clause" was "part of the consideration for our undertaking

---

4. Thomas v. Atlantic Coast Line R. Co., 5 Cir., 1953, 201 F.2d 167, 169; Alabama Great Southern Railroad Co. v. Louisville & Nashville Railroad R. Co., 5 Cir., 1955, 224 F.2d 1, 4.

5. We recognize that a part of this criticism does not apply to a case of admiralty or maritime jurisdiction in view of the more extensive power of the Supreme Court in such cases. See Gilmore & Black, The Law of Admiralty, Sec. 1–16, pp. 40–42.

6. Crescent was authorized to contract for the services of the other tugs, the Ouachita and Toltec, at the best rates available, and was not questioned on that part of the transaction.

the towage." [7] The contract then provided:

"It is particularly understood and agreed that you are authorized to and by this agreement do release and relieve us from any liability for account of your underwriters and that any damage claims urged by third parties as well as any claim which may be urged by virtue of damage to the drilling rig in the course of the towage shall be for your account and account of your underwriters."

Some liability might have rested on Crescent for unseaworthiness not caused by negligence, but the most substantial liability to which Crescent might be subjected was that based on its own real or claimed negligence. If "any claims urged by third parties," as used in the exculpatory sentence, is interpreted not to include claims based on Crescent's negligence, then the provision is deprived of any real meaning.[8]

If Dixilyn had any doubt of Crescent's intention that doubt should be removed by the next paragraph of the letter:

"It is further understood that the amount of the insurance protection which you have in force equals the value of the hull of the barge as to hull insurance and amounts to four million dollars as to third party claims."

Why should Crescent be interested in Dixilyn's insurance unless that was meant also to protect Crescent? As to third-party claims, Dixilyn's insurance was to amount to four million dollars. When that agreement is coupled with the agreement in the preceding paragraph

"that any damage claims urged by third parties * * * in the course of the towage shall be for your account and account of your underwriters," the conclusion is inescapable that Dixilyn agreed to afford Crescent the benefit of Dixilyn's insurance. There seems little doubt that Giffin and Stentz, representatives of Dixilyn's underwriters, clearly understood Crescent's intent, but chose to rely on their opinion that " * * * it's been proven that it's not legal by a prior case in court * * *."

The district court having held that the contract was not sufficiently specific to require Dixilyn to indemnify Crescent against third-party claims based on Crescent's negligence, or to bind Dixilyn to afford Crescent the benefit of Dixilyn's liability insurance, did not reach the question of whether such a contract is valid. The "prior case in court" which led Giffen and Stentz to think the contract invalid was, in all probability, Bisso v. Inland Waterways Corporation, 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911, or its companion case, Boston Metals Co. v. The Winding Gulf, 1955, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933. In those cases the Supreme Court created, or accepted as based upon public policy, a judicial rule in admiralty invalidating contracts releasing towers from all liability for their negligence.[9]

In Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, the Court held that where the exculpatory clause had been filed as part of a tariff with the Interstate Commerce Commission it should not be struck down as a matter of law until the parties had been afforded a reasonable opportunity to

---

7. In its letter of December 19, to which the proposed "Tower's Release Clause" was attached, Crescent had stated "it being mutually understood and agreed that in consideration of including this clause lower rates prevail."

8. The "Tower's Release Clause" attached to Crescent's letter of December 19 had put Dixilyn on notice that Crescent was seeking indemnity against losses resulting from its own negligence.

9. Mr. Justice Black delivered the opinion of the Court in Bisso with the concurrence of the Chief Justice and of Justices Clark and Minton, Justice Douglas wrote a separate concurring opinion and Justice Frankfurter wrote a full dissenting opinion in which he was joined by Justices Reed and Burton. Justice Harlan did not participate.

obtain the views of the Commission, and stated:

"The rule of Bisso, however applicable where the towboat owner has 'the power to drive hard bargains,' may well call for modification when that power is effectively controlled by a pervasive regulatory scheme.

"Further, it may be noted that the clause relied on in this case is by its terms restricted to the situation where shipments are transported in barges furnished by others than the towboat owner. Whatever may be the considerations involved in forbidding a towboat to contract for exemption from liability for negligence in other circumstances, it may be that different considerations apply when the towboat moves barges which are delivered to it loaded, so that it never has an opportunity adequately to inspect them below the waterline, and which, if defective, may create emergency situations where a small degree of negligence can readily lead to very substantial monetary loss. *If the peculiar hazards involved in towing a barge supplied by the shipper are great, and the methods of guarding against those hazards uncertain, it may be that in an area where Congress has not, expressly or by fair implication, declared for a particular result, the federal courts should creatively exercise their responsibility for the development of the law maritime to fashion a particularized rule to deal with particularized circumstances.*" (Emphasis supplied.) 360 U.S. 418, 419, 420, 79 S.Ct. 1215, 1216.

Virtually the same distinction suggested in the part of the last quotation which we have emphasized was adopted by the Second Circuit in an opinion by Judge Frank the year before the decision in Bisso. North River Barge Line v. Chile S.S. Co., 2 Cir., 1954, 213 F.2d 882. The Southern District of New York has since held that the stricture of Bisso is not applicable to invalidate an exculpatory clause where the tower had undertaken to tow a scow in an ice-clogged river. The district court said:

"Here, the tower, perceiving that there was unusual danger in towing in ice, made it a condition of his assuming a contract of towage that he be spared the difficulty and expense of defending himself in lawsuits resulting from accidents which were likely to result in the extrahazardous situation into which the tow owner had voluntarily put his property. Accordingly, the stricture of the Bisso case is not applicable to the limited relief from liability at issue." Chile Steamship Co. v. The Justine McAllister, S.D.N.Y., 1958, 168 F.Supp. 700, 702.

The rationale of the rule in Bisso was thus expressed in the opinion of the Court:

"The two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." Bisso v. Inland Waterways Corp., supra, 349 U.S. at 91, 75 S.Ct. at 632.

Reason (1) is inapplicable to the facts of the present case upon much the same ground as that expressed in Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., supra. Reason (2) is clearly inapplicable to the facts of this case. Crescent's acquiescence in Dixilyn's rejections of two exculpatory provisions indicates that there was no economic pressure exercised by Crescent in the negotiation of the contract. The evidence showed that Crescent had competition on movements of this kind from three harbor towing companies in New Orleans and from others in Mobile and in the Galveston-Houston area. Crescent was in no position to overreach Dixilyn or to drive a hard bargain. We conclude that, under all of the circumstances of this case, the

Bisso rule is not applicable to prevent Dixilyn from indemnifying Crescent against third-party claims based on Crescent's negligence or to prevent Dixilyn from binding itself to afford Crescent the benefit of Dixilyn's liability insurance.

 It was stipulated that Crescent carried hull insurance and protection and indemnity insurance on the tug Orleans in an amount more than sufficient to cover the amount of the claims of the libelants in this case. Dixilyn insists that, if it must indemnify Crescent, the measure of damages is the cost of Crescent's insurance and relies on Standard Oil Co. of Texas v. Wampler, 5 Cir., 1955, 218 F.2d 768, 771. In that case, Standard, after being furnished a certificate showing that the policy of insurance secured by Wampler did not protect Standard, made no objection. Judge Allred writing for this Court said:

"Under these circumstances, it seems to us the proper measure of damages would be the premiums paid for this insurance.[4]

"4. Cf. Capital Life Ins[urance] Co. v. Driscoll, Tex.Civ.App., 199 S.W. 872, 875."

The Court of Civil Appeals of Texas, in the case cited, had said:

"Where an applicant contracts for a certain character of insurance policy and such policy is refused, and he can then only obtain a like policy at an increased annual premium, the proper measure of damages, we think, is the difference between the premiums of the policy contracted for and the policy he can get." (199 S.W. at 875.)

In the instant case Crescent had received no notice prior to the collision that Dixilyn had failed to obtain insurance to indemnify it and Crescent against third-party claims whether based on Crescent's negligence or not.[10] This case is therefore distinguishable from Standard Oil

10. We, of course, intimate no opinion as to whether either Crescent or Dixilyn has a claim against Dixilyn's underwriters

Co. of Texas v. Wampler, supra, and Dixilyn is liable to Crescent for the amount, with interest and costs, paid by Crescent to the libelants. The judgment is reversed and the cause remanded for the entry of a judgment consistent with this opinion.

Reversed with directions.

since they are not parties to this litigation.