**CRESCENT TOWING & SALVAGE COMPANY, Appellant,**

v.

**DIXILYN DRILLING CORPORATION, Appellee.**

**No. 19148.**

United States Court of Appeals
Fifth Circuit.

Oct. 25, 1963.

B. H. Quin, Vicksburg, Miss., Charles Kohlmeyer, Jr., New Orleans, La., for appellant.

E. D. Vickery, Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This case having run the gamut of the federal courts [1] is back for the "ex-

1. Mississippi Highway Commission v. Dixilyn Drilling Corporation, et al., S.D.Miss. 1960, 198 F.Supp. 788; Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp., 5 Cir. 1962, 303 F.2d 237; Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78.

tremely difficult decision"[2] on review of the district court's findings of fact which we should have made in the first instance. In our earlier opinion, cited in footnote 1, supra, we have stated the case sufficiently for an understanding of the present opinion. We have again carefully read and studied the four-volume record and the original exhibits in connection with the opinion of the district court and the briefs and arguments of counsel.

The district court held Crescent solely responsible for the damages sustained by the Natchez-Vidalia Bridge when the top of the after starboard leg of Dixilyn's Gargantuan off-shore drilling barge Julie Ann collided with the underside of the bridge. In more detail, it held: (1) that Crescent's Captain Brechtel "was in complete charge and control of the flotilla"; (2) that "Crescent was negligent in not furnishing sufficient power to hold the Julie Ann against the current when its legs were being extended to the required depth of 55 feet"; (3) that "the Tug Orleans was unable to exert its full power because of a defective engine which failed at the crucial moment"; (4) that Captain Brechtel "was also guilty of negligence in not completely stopping the flotilla and lowering the legs to a depth of 55 feet before it reached the Natchez bridge"; (5) that "he was negligent in his failure to notify Hughes earlier when to lower the legs and in not stopping immediately after he crossed the rock ledge in order for Hughes to have lowered the legs to a depth of 55 feet"; (6) "Hughes exercised reasonable care * * * and was guilty of no negligence that in any way contributed to the collision." Keeping in mind the clearly erroneous rule,[3]

2. 303 F.2d 239; 372 U.S. 698, 83 S.Ct. 968, 10 L.Ed.2d 78.

3. McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20; C. J. Dick Towing Co. v. The Leo, 5 Cir. 1953, 202 F.2d 850, 854.

4. "A. [Mr. Hughes] As I said, with consultation—after consultation with Mr. Tidwell [also Dixilyn's employee] and myself, with the decision being made by the two of us, the order was given by me that we would proceed down river.

we consider each of those findings in order.

(1) *Respective Duties of Brechtel and Hughes.* Captain Brechtel was in over-all charge of the flotilla, but Dixilyn's resident engineer Hughes was in command of its three and a half million dollar (R. 564) rig, the Julie Ann. Captain Brechtel had not arrived when the journey began at Vicksburg. Hughes gave the order to begin the trip.[4] In describing his duties, Hughes testified:

"Q. In connection with the movement from Vicksburg to New Orleans, what, if any, duties did you have aboard the drilling rig?

"A. The duties were responsibility for the safety of the crew aboard, the people aboard the barge, and as representative of Dixilyn I was to, when the rig left shore at Vicksburg, then the rig was turned over to us; LeTourneau now released all holding on that rig at that time, and my responsibility was to operate and raise and lower those legs." (R. p. 532.)

Captain Brechtel testified:

"Q. You knew, did you not, Captain Brechtel, in connection with this flotilla that you were in complete control of it, insofar as navigation and the speed is concerned?

"A. Yes, sir.

"Q. You were in complete control of it except for the actual lowering of the legs at the time that you said it was proper to lower them? Isn't that true?

"A. That's right." (R. p. 318.)

"Q. That was a joint decision but the actual order to proceed was yours? Is that it?
"A. Yes, that's right." (R. p. 565.)
See also record p. 225, where Captain Clark of the large Tug Toltec testified:
"Q. Who gave the orders to get underway?
"A. [Captain Clark] The same gentleman that I referred to to begin with. I believe I called his name as Mr. Hughes, and he was the one giving the orders."

**(2) *Power to Hold the Julie Ann.*** While Dixilyn's experts and Crescent agreed that 6000 horsepower was sufficient to effect the movement (R. 160, 161), the final responsibility was that of Crescent.[5] The tugs furnished were the Toltec, horsepower 3,975, the Ouachita, horsepower 1,800, and the Orleans, horsepower 700, or an aggregate horsepower for the three of 6,475.

Captain Brechtel had been working on the river "from deckhand to master" since 1929 (R. 281, 282), that is, for nearly thirty years. His experience was such that he was agreed on in advance by all parties to be in charge of the movement.[6] Captain Brechtel thought the horsepower ample, and testified:

"A. * * * I had brought the rig down previous to this, and we did not have the Toltec. We had simply the Ouachita and the tug Orleans, a rig similar in construction and as big, and we did the job with no trouble, and we did not have the Toltec. We stopped it above the bridge in the same spot. We lowered the legs, drifted through the bridge, and the whole thing, from beginning to end, was without incident, without the use of the Toltec.

"Q. What was your river stage at Natchez at the time?

"A. Well, that has been quite a while and off-hand, I would not know.

"Q. You say that rig was just as big?

"A. I'd say that there was very little difference in it; not so much so you would need additional 4000 horsepower." (R. 342, 343.)

Captain Clark of the large Tug Toltec testified: "It is my opinion that we did have sufficient horsepower." (R. 260.)

Captain Wilson was the master of the United States Engineering Corps sounding boat which was preceding the flotilla. He had been a master pilot for 20 or 22 years (R. 77). He was of the opinion that the tugs had sufficient power to handle the flotilla properly (R. 93, 98, 114).

As the tow approached the bridge, it became obvious that the legs might not clear. Mr. Hughes called for another

5. Crescent's Vice President, William S. Smith, Jr., testified:

"Q. You were holding yourselves out to Dixilyn to be expert in the towage, not only in barges and harbor towing, but as an expert in performing this particular towing?

"A. Correct.

"Q. From your particular experience?

"A. Correct.

"Q. And you went to them not asking them for the advice as to the amount of horsepower that ought to be used in this tow?

"A. We went to them and made suggestions as to the horsepower that should be used, that is correct.

"Q. And actually Dixilyn asked you for the amount of horsepower that you thought ought to be used in connection with this towage?

"A. Correct.

"Q. They asked you in your capacity as an expert tower, did they not?

"A. Correct.

"Q. And you expected them to rely on the recommendations you made with respect to the horsepower?

"A. That is correct. We were all in agreement when we left there." (R. 164, 165.)

6. Crescent's Vice President Smith testified:

"Q. Was any discussion had about the personnel who was to be on the Crescent vessel involved, or vessels, involved in this movement?

"A. We were asked if Captain Brechtel would be available to go on this movement, and we assured them we would make him available to come down with the tow.

"Q. What was Brechtel's special involvement in this?

"A. He was to coordinate the movement of the three vessels in bringing the rig down.

"Q. What was his experience involved in towing rigs down-river?

"A. Well, this was to be the third one he had towed down, and he holds a license all the way up to Cairo, St. Louis. He has been on river towing.

"Q. He had handled the prior tows Crescent had brought down?

"A. That is correct." (R. 151, 152.)

check on the legs and received a reply from the observer at the after starboard leg that its depth was 45 feet (instead of the required 55 feet). Captain Brechtel immediately ordered the tug boats full speed ahead (R. 305). Captain Clark, master of the large tug Toltec, estimated that when he received this order his tug was "approximately 150 to 200 feet above the bridge" (R. 236). It was then too late. Captain Brechtel testified that, "I would say with an additional 4000 horsepower and on such a short notice, that we would not have been able to stop it within at least another half-mile of the river." (R. p. 331.)

The failure of the tugs to hold the Julie Ann on such short notice does not indicate that the power furnished was insufficient to effect the movement. The decided weight of the evidence is that sufficient power was furnished.

(3) *Failure of Tug Orleans.* As has been stated, the Tug Orleans had 700 horsepower as compared with 1800 for the Ouachita and 3975 for the Toltec. The engine of the Tug Orleans failed either immediately before or immediately after it passed under the Natchez-Vidalia Bridge.

Captain Shiroh and Chief Engineer Ricord of the Tug Orleans and Captain Brechtel testified that there was no failure of the engines on the Orleans until after they had crossed under the bridge. The engine log book of the Orleans so indicates, but it also shows that work was done on the engine on December 21, 23, 25 and 26, prior to the collision, and that after the collision inspection revealed that the No. 8 cylinder had to be removed and the No. 2 piston had burst. The log book on the Toltec contained an entry "Tug Orleans engine stopped above bridge," which the master, Captain Clark, undertook to explain as entered upon hearsay information received after the accident. Mr. Wood's report, received in evidence because of Wood's death prior to the trial, reflected that the engine on the Orleans failed about 150 feet up-

stream from the bridge. Tidwell, Gill and Moody, employees of Dixilyn, furnished hearsay evidence that the engine failure was before passing the bridge.

On this question we would not hold that the finding of the district court was clearly erroneous. We do not, however, think that decision of the case turns on whether the Orleans' engine failed just before or just after the bridge was passed.

(4) *Failure to Test Holding Power with Legs Lowered to Required Depth of 55 Feet.* When the flotilla was abreast of Learned's Mill, about a mile or a mile and a quarter upstream from the bridge, Captain Brechtel asked Mr. Hughes to put the legs down to 35 feet. He then ordered the tugs to come full speed ahead, stopped the flotilla and held it until satisfied that the control was perfect. (Captain Brechtel, R. 292, 338; Captain Clark, R. 236; Mr. Hughes, R. 536, 540.) Captain Brechtel and Captain Clark testified that the rig was brought to a second stop at about the cable crossing, a quarter of a mile upstream from the bridge (Captain Brechtel, R. 294, Captain Clark, R. 245); that the rig was then held stopped in the water for 20 to 25 minutes (Captain Brechtel, R. 294, 295, 335; Captain Clark, R. 245, 247). According to Captain Brechtel, the legs were then lowered until Hughes reported that all three legs were at the required fifty-five feet (R. 298). Hughes testified differently, as will be discussed in considering the district court's next finding of negligence. If Hughes' testimony is accepted, we would agree that Captain Brechtel was negligent in failing to test the holding power with the legs lowered to the required depth of 55 feet. If the testimony of Captain Brechtel is accepted, such failure to test had no proximate causal connection with the collision. For reasons hereafter stated, we think that Captain Brechtel was testifying truthfully.

(5) *Failure to Notify Hughes to Lower Legs.* Hughes testified that after he obtained 36 or 37 feet of draft on the

three legs, he was never again ordered to lower the legs.[7]

Hughes' testimony in that respect was corroborated by the testimony of Hollis Gill, a tool pusher for Dixilyn.[8]

Lloyd T. Cotton, an employee of R. G. LeTourneau, introduced as a witness by Dixilyn, testified that Captain Brechtel ordered the legs lowered about 10 or 15 minutes after Hughes first requested permission to lower them (R. 488–490).

The credibility of the Hughes version is seriously impeached by a statement which he gave on the Coast Guard investigation, within a month after the accident, vouching for the facts as then stated by Captain Brechtel. Captain Brechtel's statement bearing Hughes' endorsement reads as follows:

"New Orleans, La.
"23 January 1958

"Statement of John J. Brechtel concerning the collision of the Drilling Rig 'Julie Ann' with the Natchez-Vidalia Highway bridge on 27 December 1957.

"My name is John J. Brechtel and on 27 December 1957 I was employed by Crescent Towing Co. as their representative in guiding the tow of the Julie Ann.

"In this operation I was stationed in the control room of the Julie Ann and directed the movements of the tow boats through an intercom system.

"There were three boats, 'Toltec,' 'Orleans' and 'Ouachita' used. All three were seated abreast in pushing position on the stern of the Julie Ann. The Toltec was in the middle, the Orleans on the stbd side and the Ouachita on the port side. An Army Engineers boat also named Orleans was proceeding ahead of us to report soundings as we approached the Natchez-Vidalia bridge.

"Approximately 450 ft. above the bridge there is a rock ledge in about 50 ft. of water which necessitated keeping the legs of the Drill Rig high in the air

"John J. Brechtel    'A'(1)
"p. 2

until the ledge is crossed. After passing over the ledge the rig was swung around so that the tow boats could push ahead to counteract the effect of the current and hold the rig while the legs were lowered sufficiently to pass under the bridge. The legs were supposed to be lowered to a depth of 55 ft. to insure clearance under the bridge.

"A man was stationed at each leg to report the depth to Mr. Hughes who was controlling their lowering from the control room. Mr. Hughes had asked for a

7. "Q. As you approached the bridge, Mr. Hughes, was there any conversation between you and Captain Brechtel with respect to the starting of the lowering of those legs?
"A. Well, as we approached the bridge with the legs extended below the barge to this predetermined setting, we began to pick up a little more momentum, and I became concerned and asked Captain Brechtel for the first time if he was ready to start lowering those legs, and he said, 'No, hold it for a little while longer.' So I held up for approximately four or five minutes. It's hard to judge time there when you are waiting tensely for something to occur. And then I asked him again, and he said, 'No, just hold up for a little while longer.' And so I held up until I saw the danger of the situation, that we were picking up too much speed in regard to the barge moving toward the bridge, and that, of course wasn't from my water knowledge or tow knowledge at all; it was just merely from observation and judging the distance and the momentum of the rig.

So I looked around and there was still no inclination whatsoever that I start lowering the legs, but I did start lowering the legs.
"Q. Did you ever get an order from Captain Brechtel to start lowering those legs before you started them?
"A. No, sir.
"Q. You did that on your own initiative?
"A. I did that on my own initiative." (R. 537, 538.)

8. "Q. Did you overhear any request made by Mr. Hughes of Captain Brechtel to permit him to start lowering the legs?
"A. Yes, he asked if he wasn't ready to start lowering them, and he said, 'No, let's wait a minute.' In a short time he said, 'You can go ahead and start lowering them.'
"Q. Did you observe Mr. Hughes start lowering the legs at that time?
"A. Yes, sir, when he started lowering the legs I left the control tower." (R. 425, 426.)

report on the leg depths and received replies that each was at 55 feet. I then ordered the tow boats engines slowed to allow the tow to drift under the bridge. Just as we were approaching the bridge Mr. Hughes called for a recheck on the readings. The man on the port after leg answered 55 ft. and the man on the stbd leg gave 45 ft. The legs were still being lowered at the time but the rate of descent is only one foot per minute. I immediately ordered all boats full speed ahead but could not stop the tow

"John J. Brechtel   'A'(2)
"p. 3

completely. We were just barely moving when the very top of the stbd leg struck the lower bridge girder. The part that struck was the outward column of the triangular leg because we were angled to the west bank to keep clear of the pier.

"The rig tilted slightly and passed under the bridge without touching anything further.

"The horsepower of the tugs was Toltec 3900 (triple screw), Ouachita 1800 (twin screw), Orleans 720 (single screw).

"John J. Brechtel

"Subscribed and sworn to before me this 23rd day of January 1958.

"George T. Treffs
"LCDR, USCG

"My name is Wayne B. Hughes, 2707 Bay Spring Rd. Laurel, Miss. and I am employed as Tool Pusher on the Drilling Rig 'Julie Ann.' I have read the above three page statement and am in agreement with the facts stated.

"Wayne B Hughes
'A'(3)"

Hughes' explanation when confronted with that statement is far from satisfactory:

"Q. You then, Mr. Hughes, stated: 'I have read the above three page statement and am in agreement with the facts stated.' The statement I referred to is Captain Brechtel's statement to the Coast Guard. Do you recall having read that statement?

"A. I recall having read over it hurriedly because the officer in charge of the situation at that time was anxious to get to court across the hall at a proceeding they had going there, and he said in order to speed the thing up if I would glance through that report—and, of course, he took my statement orally at first— and then glance through that statement and sign the statement. I called his attention to the difference in the draft marks and he said, 'Well, if there's no more difference than that is, that will not make any difference.'

"Q. What do you mean, you 'called his attention'?

"A. I called his attention to the draft marks stated in the report made by Captain Brechtel.

"Q. I ask you, Mr. Hughes, if this is your signature on this report?

"A. Correct.

"Q. And you did read the Brechtel statement before you signed this?

"A. Yes.

"Q. And you did say that you were in agreement with the facts stated therein?

"A. With the exception of the draft reading.

"Q. Is there any exception to your full accord with the Brechtel statement insofar as this statement is concerned?

"A. This officer right here—

"Q. —I say insofar as this statement is concerned.

"A. There is no exception shown on it.

"Q. How did you happen to go to the Coast Guard?

"A. They asked us to come over and give a statement, asked Captain Brechtel and myself.

"Q. And you went over as Dixilyn's representative?

"A. As such, yes.

"Q. And you did not think when you signed this statement—I guess I had better rephrase that. You saw this statement that Captain Brechtel had said that there was a mis-reading reported to you, and you nevertheless were in agreement with those facts, without calling that to the attention of the Coast Guard?

"A. I did call that to the attention of the Coast Guard officer.

"Q. You did?

"A. Yes. That was the question in the whole report that I didn't agree with, and because he was in a hurry to get through, he said that he didn't think it would be necessary to make out a statement in my words as long as he took it orally, and then gave me this one to look at." (R. pp. 555–558.)

Even if Hughes' claimed correction of the statement were accepted, he nonetheless at that time corroborated Captain Brechtel's statement in all other respects.

We are left under the firm impression that the facts were as stated by Captain Brechtel to the Coast Guard and as testified to by him on the trial.

(6) *Did Hughes Exercise Reasonable Care?* As has been stated, Hughes admitted that "my responsibility was to operate and raise and lower those legs." (R. 532.) Hughes could not see the draft marks himself but relied on reports given to him by Tidwell, who was in turn relaying the information from Dixilyn's employees stationed at each of the three legs. (Tidwell, R. 404; Hughes, R. 544, 548, 549.) Hughes knew that "we would have to get the legs down approximately fifty-five or sixty foot to clear the bridge" (R. 534). All of the evidence was to the effect that at least fifty-five feet of each leg must be submerged in the river in order for the top of the leg to clear the underside of the bridge.

On cross-examination Hughes drew a rough sketch (R. 550) to demonstrate how the readings of the leg drafts were taken:

*THE HUGHES SKETCH*
*CRESCENT EXHIBIT 18 (Tr. 553)*

On the Hughes Sketch, "W" indicates the water line, "T" the tank at the bottom of the leg, "L" the leg, "P" the point from which the draft was read, "B" the bottom of the barge (R. 551). The distance from "P" to "W" was 10 to 12 feet, and from "W" to "B" was 12 to 14 feet (R. 551).

The men stationed at the legs read the draft marks at point "P" and called that information to Tidwell, who relayed it on to Hughes, except that "he at times, on several occasions that he gave me the draft he would give me the reading of the leg, the footage on the leg that was in the water, and then make his correction by adding the draft of the barge to it." (R. 548.) (See also Tidwell's testimony at pp. 404–406 of record.) Hughes' testimony on cross-examination revealed a complete misconception in the term "draft" (see R. pp. 547–553), and culminated as follows:

"Q. When you said there would be a draft of fifty-five or sixty feet to go under the bridge, what did you mean by that draft? Did you mean a reading of a draft at point 'P' or a reading of a draft at 'W' on the sketch?

"A. A reading at point 'P'.

"Q. At point 'P'?

"A. Yes, sir.

"Q. Now, how much of the leg then would be on top of the water line if you had a fifty-five foot draft at point 'P'?

"A. With fifty-five foot at point 'P' there would be approximately sixty-five foot in the water, and with a one hundred forty-three foot total length that would leave about seventy-five foot or eighty foot above the water with fifty-five foot in the water.

"Q. And so on that basis, you were perfectly content to proceed through the bridge with a fifty-five foot draft on point "P"?

"A. Yes, sir.

"Q. Because you would have plenty of clearance?

"A. Yes, sir." (R. pp. 552, 553.)

That testimony showed, we think, that the cause of the collision could be simply explained by the failure of Hughes properly to call the draft of the legs to Captain Brechtel.

Notwithstanding that devastating cross-examination, on re-direct Dixilyn's able proctor, perhaps wisely, asked Hughes but a single question:

"Q. Mr. Hughes, how long were you delayed in departing from Vicksburg?

"A. Almost two hours." (R. p. 567.)

If Hughes were simply confused, or if there were any other explanation for his apparent misconception, there remained ample opportunity to recall Tidwell, or to call one or more of Dixilyn's employees stationed at the three legs. That was not done, even though the proctors had previously on several occasions discussed the applicable presumption (see R. 202, 347). Dixilyn's failure to produce these important witnesses raises the presumption or inference that their testimony would probably have been unfavorable to Dixilyn.[9]

Dixilyn is liable to Crescent for the amount, with interest and costs, paid by Crescent to the libelants. The judgment is reversed and the cause remanded for the entry of a judgment consistent with this opinion.

Reversed with directions.

9. Clifton v. The United States, 1846, 4 How. (45 U.S.) 242, 246, 11 L.Ed. 957; The New York, 1899, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126; Coyle Lines v. United States, 5 Cir., 1952, 195 F.2d 737, 741; Griffin on Collision, p. 633, Sec. 276.