Complaint of Twenty Grand Offshore, Inc., etc.

**TWENTY GRAND OFFSHORE, INC., Plaintiff-Appellant,**

v.

**WEST INDIA CARRIERS, INC., Claimant-Appellee.**

No. 72-3314.

United States Court of Appeals, Fifth Circuit.

April 12, 1974.

---

G. Morton Good, Miami, Fla., John W. Sims, New Orleans, La., for plaintiff-appellant.

Richard F. Ralph, Miami, Fla., for claimant-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

DYER, Circuit Judge:

The question posed by this appeal is whether the provisions of a towage contract, requiring the owners of a tug and tow to fully insure their respective vessels and to obtain in each of the policies a waiver of subrogation and a designation of the other party as an additional insured, are invalid and unenforceable as exculpatory clauses contrary to public policy. The district court found the towage contract invalid and entered judgment for the tow. We disagree and reverse.

On the evening of October 30, 1969, the tug EL MULO GRANDE, owned by Twenty Grand Offshore, Inc., had the barge WISCO RANGER under tow. Four miles offshore of Hollywood, Florida, the tug and tow apparently encountered heavy weather. During the storm, the towing hawser parted, and the barge WISCO RANGER, driven by the seas and waves, stranded on the beach. Subsequently, in a limitation proceeding, the district court denied the tug owner exoneration from or limitation of liability, found negligence and privity, and awarded the barge owner damages.[1] The finding of negligent towage is not contested on appeal.

The heart of the controversy is whether, by virtue of the provisions of the towing agreement and the circumstances existing at the time of its execution, the agreement is valid and enforceable, or whether it is within the parameters of Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911, which prohibits a contractual exemption of a towboat owner from responsibility for his own negligence.

The towing agreement *sub judice* provides in pertinent part as follows:

(3) Owner [Twenty Grand, the tug owner] agrees to procure, pay for and maintain in full force and effect throughout the term of this agreement, hull and machinery insurances in an amount at least equal to the value of the vessel and full form protection and indemnity insurance with a limit in the amount of at least one million dollars ($1,000,000.00). Principal shall be named as an additional assured in all of said policies and such policies shall contain a waiver of subrogation in favor of principal.

Principal [West India Carriers, Inc., the barge owner] agrees to procure, pay for and maintain in full force and effect through the term of this agreement, hull and machinery insurance in an amount at least equal to the value of the barge and full form protection and indemnity insurance with a limit of at least one million dollars ($1,000,000.00). Owner, the vessel, its master and crew shall be named as additional assureds in all of said policies and such policies shall contain a waiver of subrogation in favor of owner, the vessel, its master and crew.

---

1. The barge owner's insurance company has reimbursed the barge owner $120,000 and is, at least to this extent, the primary party in interest.

Proper evidence of such insurance shall be furnished owner.[2]

The facts and circumstances surrounding the execution of the towing agreement are largely undisputed. Twenty Grand Offshore, Inc., the tug owner, is the wholly owned subsidiary of Tidewater Marine Service, Inc. It is one of eight to ten offshore towboat companies operating along the Gulf Coast and eastern coast of the United States. States Marine Lines, Inc., the owner of the barge WISCO RANGER, owns steamships and barges and is an affiliated corporation of West India Carriers, Inc., which was the demise owner, under a bareboat charter of the barge.

The barge owner solicited bids from several towboat companies to enter into a towing agreement for the towage of the WISCO RANGER. The tug owner was selected on the basis of competitive price which was less than other prices submitted to the barge owner for the same service. One of the factors considered by the tug owner in arriving at its bid price was the inclusion of Clause 3 in the towing agreement, since the price for the towage would have been greater without Clause 3 in the agreement. In other towing agreements the tug owner had agreed to the elimination of Clause 3 but only with an increase in the towing rate.

No contention was made or evidence introduced to show that there was a monopoly of the towboat market or that there was any form of a monopolistic agreement among towboat operators. There was likewise a clear absence of any showing that the barge owner was overreached by the tug owner, or that the tug owner was in a position to drive hard bargains.

Notwithstanding barge owner's contractual obligation to do so, it was stipulated that barge owner failed to have tug owner or its tug named as an additional insured. In addition, the barge owner failed to obtain a waiver of subrogation from its underwriters, even though the underwriters had no objection to giving such a waiver.[3] On the other hand, tug owner did comply with its contractual obligation by having barge owner named as an additional insured and by securing a waiver of subrogation.

The district court found that the towage agreement was not exculpatory but that it was an indirect attempt at exculpation because the effect of the waiver clauses was "the same as the Bisso-invalid clauses." It recognized that the clauses present in *Bisso* were not insurance clauses but simply provided that the towing would be at "the sole risk" of the barge, and "that the tug's master,

---

2. The towing agreement also contained the following clause:

Anything to the contrary notwithstanding, [n]either Owner, the vessel, its Master or crew shall be liable for loss of or damage to the cargo, the barge or equipment aboard the tow, however arising, including but not limited to errors in navigation or management of the vessel, fire or explosion, or defect in the hull, machinery and equipment of the vessel or unseaworthiness thereof, or the negligence of the Owner or otherwise. The Principal agrees to protect, defend, hold harmless, and indemnify Owner, the vessel, its Master and crew of and from any claims, suits, actions, liability, loss or damage to the cargo, the barge or equipment aboard the tow, however arising, whether through errors of navigation or management of the vessel, fire or explosion, defect in the hull,

machinery and equipment of the vessel, or the unseaworthiness thereof, or the negligence of Owner or otherwise.

The tug owner disclaimed any reliance on this clause as being clearly within the reach of *Bisso* and offered to pay to barge owner whatever damages were not validly collected from barge owner's underwriters. Hence the only issue before the district court, after negligent towage was found, was the legal effect of Clause 3 of the towing agreement. This was the sole issue argued on appeal.

3. The barge owner's hull policy provided: "The assured shall not be prejudiced by reason of any agreement limiting or exempting the liability of . . . tugs and/or towboats and/or their owners when the assured, . . . accepts such contracts in accordance with the established local practice."

crew and employees would, in the performance of their duties, become 'employees' of the barge." Pointing out that the sole risk provision was found to be exculpatory and against public policy, the district court then focused on the second, or imputed employees clause, which had again been invalidated in Boston Metals Co. v. The Winding Gulf, 1955, 349 U.S. 122, 75 S.Ct. 649, 99 L. Ed. 933, and analogized the indirect attempt to exculpate the tug by use of imputed negligence of an employee with the use of the insurance clauses *sub judice*, concluding that the Supreme Court forbade tug owners from doing indirectly what could not be done directly.

The barge owner supports the district court's conclusion by this syllogism: *Bisso* condemns any clause that is exculpatory in relieving the legal liability of a negligent tower; compulsory insurance clauses are exculpatory; compulsory insurance clauses are therefore condemned.

The tug owner responds that the insuring provisions in the towing agreement are not an indirect attempt to accomplish what *Bisso* prohibits; that they make no effort to, and indeed do not, regulate the rights of the tug and tow *inter se*. The clause does not prevent the barge owner from suing the tug owner or from obtaining a judgment against the tug owner. It simply precludes the barge owner's insurance company from suing and recovering from tug owner losses which it had paid or is obligated to pay to the barge owner on account of an insured casualty. The tug owner's liability to the barge owner is unaffected by the insurance clause. Finally, tug owner argues that public policy considerations cannot dictate which party to a contract pays the insurance premium and that that is all the clause in question requires.

It is obvious that this is not, as was *Bisso*, a "towing movement * * * at the sole risk of the barge," or the imputation of the employees of the tug to be the employees of the barge. Nevertheless, we are called on to determine

whether the insurance clause here involved comes within the purview of the "judicial rule, based on public policy, invalidating contracts releasing towers from all liability for their negligence," keeping in mind that "[t]he two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." *Bisso, supra* 349 U.S. at 90, 91.

Both the district court and the barge owner lean heavily on Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L. Ed.2d 78, which reversed our holding that *Bisso* was inapplicable in the factual context of that case. Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp., 5 Cir. 1962, 303 F.2d 237. In *Crescent*, the towing agreement provided that "any damage claims urged by third parties as well as any claim which may be urged by virtue of damages to the drilling rig in the course of the towage shall be for your account [the barge owner] and account of your underwriters." 303 F.2d at 241. This Court found no overreaching to drive a hard bargain. More importantly, we found that the other reason explicated in *Bisso*, i. e., to discourage negligence by making wrongdoers pay damages, was inapplicable to the facts in *Crescent* upon much the same ground as that expressed in Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L. Ed.2d 1334. We quoted from that case as follows:

> *If the peculiar hazards involved in towing a barge supplied by the shipper are great, and the methods of guarding against those hazards are uncertain, it may be that in an area where Congress has not, expressly or by fair implication, declared for a particular result, the federal courts should creatively exercise their responsibility for the development of the*

*law maritime to fashion a particularized rule to deal with particularized circumstances.* (Court's emphasis) 303 F.2d at 246. We then concluded in *Crescent*

> \* \* \* that, under all the circumstances of this case, the Bisso rule is not applicable to prevent Dixilyn from indemnifying Crescent against third-party claims based on Crescent's negligence or to prevent Dixilyn from binding itself to afford Crescent the benefit of Dixilyn's liability insurance.

On certiorari, the Supreme Court found that this Court's holding in *Crescent* was squarely in conflict with *Bisso* and that our attempt to distinguish *Crescent* "because the peculiar hazards of towage and other factors" brought it within the ambit of *Southwestern Sugar* was invalid. The Court pointed out that *"Southwestern Sugar* is not applicable here, for in that case the Court merely preferred to give the Interstate Commerce Commission an opportunity to rule on an exculpatory clause which was a part of a tariff filed with the Commission." *Dixilyn, supra,* 372 U.S. at 698. Mr. Justice Harlan's concurring opinion highlighted the holding in *Dixilyn:* "Certainty in the law governing commercial transactions of this kind is an overriding consideration which would not be promoted by opening the *Bisso* rule to indeterminate exceptions, in instances where, unlike *Southwestern Sugar,* no functions of a regulatory agency are involved." *Id.* at 698.

It would seem clear from *Dixilyn* that "peculiar hazards of towing" and similar "indeterminate exceptions" contained in exculpatory clauses cannot be utilized to undercut the adjuration of *Bisso.* But that is not this case.

Here there was a fair, arm's length negotiation culminating in a towing agreement which neither by indirection nor otherwise relieves the tug owner or the towboat of its liability to the barge owner as the result of the towboat's negligence. The barge owner could have sued the tug owner if the insurance underwriters had, for whatever reason, failed to pay. Indeed, it is admitted that the tug owner is liable for damages sustained as the result of loss of use of the barge, as well as any other losses not covered under the policy.

Under the circumstances of this case we must determine if the *Bisso* doctrine is so encompassing that in instances of fair dealing, with no anti-competitive forces at work, the parties to a towing contract cannot agree to include an insurance clause and thereby reduce the towing rate while not affecting the rights of the tug and barge *inter se,* or eliminate the clause and accomplish the towing at a higher rate. We are of the view that *Bisso* contemplated no such expansive interpretation.

The simplistic, syllogistic approach of the barge owner is inviting because we agree with the major premise that *Bisso* condemns exculpatory clauses that relieve the legal liability of a negligent tower. But the minor premise that compulsory insurance clauses [4] are exculpatory *per se* in the context of *Bisso,* is unsound. Such a doctrinaire interpretation is not supported by the reasons undergirding *Bisso.*

This Court considered an analogous situation in Fluor Western, Inc. v. G. & H Offshore Towing Co., 5 Cir. 1971, 447 F.2d 35, cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793. There the tower was sought to be held for the loss of the cargo resulting from the sinking of the barge being towed. The underwriters who insured the cargo paid the owner for its loss and thus the underwriters were the real party in interest. The tower urged that by virtue of a

---

4. The word "compulsory" as used to describe the insurance clause was coined by proctor for the barge owner as a word of art to differentiate the insurance clause *sub judice* from clauses giving the benefit of voluntary insurance. It is not used to demonstrate or imply that the barge owner is under any compulsion to obtain insurance without waiver of subrogation.

clause in the towing agreement between the tower and barge owner the cargo owner was required to carry full insurance on the cargo with a waiver of subrogation. The plaintiff countered that the contractual provision was meant to absolve the tower of responsibility for negligence and was void under the principles established in *Bisso* and *Dixilyn*. We rejected this argument. Because of the pertinency of what was there said, it bears repeating here:

It appears that the overriding consideration in *Bisso* was the supposed inequality of the bargain position of the tug industry and those in need of its services. The other reason stated in *Bisso* for the rule there announced —to discourage negligence by making wrongdoers pay damages—was, I believe, of limited importance and merely served to support the decision, for, in absence of an unconscionable disparity in bargain positions, contracting parties should be free to distribute liabilities and costs as they wish.

\* \* \* \* \* \*

\* \* \* Unlike the situation in *Bisso*, the plaintiff did not waive its right to proceed against any party responsible for the cargo loss. Although the cargo owner, pursuant to the contract, procured insurance fully covering the cargo being shipped, and presumably was reimbursed by insurance proceeds for the loss incurred, it nevertheless had the right to proceed against the barge, tug and their owner, charterers and operators if the insurance underwriters had, for whatever reason, failed to pay. With respect to the rights of the cargo owner, the carriage contract did not exculpate these potential defendants, protect them from suit by the cargo owner, or fix their respective liabilities, \* \* \*

\* \* \* Actually, no rights at all were waived by the carriage agreement itself. The cargo owner agreed to procure cargo insurance with a waiver of subrogation clause, but the insurance underwriters' subrogation rights were waived only by a later and independent agreement reached between the cargo owner, as the insured, and the underwriters. It is not alleged that the execution of the carriage agreement bound any insurance underwriters in any manner at all. It is difficult to imagine how any monopolistic condition that may have existed in the tug and barge industry could have been exploited to compel the underwriters to agree to waive their rights of subrogation. \* \* \*

\* \* \* The only thing that could conceivably have been adhesive in the towage contract involved here would be the cargo owner's agreement to pay the premiums of the insurance that was to be procured. I do not think, however, that the public policy expressed in *Bisso* requires that any particular party should necessarily bear the cost of such insurance, particularly when the party that does bear the cost had an insurable interest in the cargo and is to be the named insured, as is the case with the plaintiff in this suit. *See*, Great American Insurance Co. v. Gulf Marine Drilling No. 1, 302 F.2d 332 (5th Cir. 1962).

The barge owner acquiesces in the holding of *Fluor Western* only so far as it was predicated on the finding that the insurance company was the real party in interest as subrogee and, having acted voluntarily as a non-party to the towing agreement, was bound thereby. The holding that the clauses were not exculpatory and hence not invalid is denigrated by barge owner as dictum. Moreover, it is argued, that since the insurer waived subrogation it, as the real party in interest, could not later pursue the tower. Finally, both the barge owner and the district court draw a distinction between *Fluor Western* and this case because that decision involved a cargo loss, while here the loss of the barge itself is of concern.

We can discern no basic difference between *Fluor Western* and this case. The fact that it involved cargo insurance and cargo damage rather than barge insurance and barge damage is a distinction without a difference. *Fluor Western*, as does the instant case, involved a towing agreement, and simply because cargo laden aboard the tow was damaged rather than the tow itself can conceptually make no difference. Likewise, the record in this case shows indisputably that the barge underwriters have paid at least $120,000 and thus must be the real party in interest. We confess our inability to comprehend barge owner's rationale of *Fluor Western*, that if the towing agreement provides for a waiver of subrogation, which is *ipso facto* invalid under *Bisso*, and the barge's underwriters have not waived subrogation, it or the barge may pursue the tower, but notwithstanding the invalidity of the towing agreement provision, if the barge's underwriter has waived subrogation it may not pursue the tower. Said another way, if the barge *complies* with its contractual obligation to effect a waiver of subrogation it may not sue the tower, but if the barge *breaches* its contractual obligation to effect a waiver of subrogation it is free to pursue the tower.

We are of the view that the *ratio decidendi* of *Fluor Western* is fully applicable and controlling in this case. We thus deem it inutile to consider cases involving different legal principles concerning common carriage and the relationship between carriers and shippers.

We conclude that the provision in the towing agreement requiring each party to fully insure its vessel, to effect a waiver of subrogation, and to name the other party as an additional insured is not an exculpatory clause of the type invalidated in *Bisso* and *Dixilyn*.

Reversed.

GODBOLD, Circuit Judge (specially concurring):

Because we struggle in this case, as others have, to accommodate Bisso [1] to the context in which towboat and barge seek to decide by contract who will bear the cost of insurance, it may be useful for me to state in a separate opinion my views and process of reasoning. If free to do so, I could with comfort hold that, at least absent monopolistic compulsion, towboat and towed vessel can bargain as they wish over both allocating the cost of insurance and concomitantly releasing from liability for negligence.[2]

But the fly in the ointment is Crescent Towing & Salvage Co. v. Dixilyn Drilling Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), a per curiam decision which reversed, citing *Bisso*, the decision of this court, 303 F.2d 237 (C.A.5, 1962). The clause involved stated:

It is particularly understood and agreed that you are authorized to and by this agreement do release and relieve us from any liability for account of your underwriters and that any damage claims urged by third parties as well as any claim which may be urged by virtue of damage to the drilling rig in the course of the towage shall be for your account and for the account of your underwriters.

It is further understood that the amount of the insurance protection which you have in force equals the value of the hull of the barge as to hull insurance and amounts to four million dollars as to third party claims.

The Supreme Court treated this as "a contract which exempts the tower from

---

1. Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955).

2. Even where the tower has monopoly power, it is by no means clear that *Bisso* serves much purpose. To the extent that the tower has such power he has the ability to pass on to the barge in the form of an increase in price his cost of insurance. Thus, preventing the tower from contractually assigning to the barge the responsibility for obtaining insurance may accomplish no change in payor but only a transformation in the form in which the barge pays for the insurance—price for towage rather than payments to the insurance company.

liability for its own negligence" in violation of *Bisso*. In essence Dixilyn (towed) agreed to indemnify Crescent (towboat) for third party claims arising from Crescent's negligence. It appears to me that the agreement did not contemplate that the liability to third parties would ultimately rest on Dixilyn, at least where, as was the case, the liability did not exceed $4,000,000. At first glance this looks about as much like an insurance clause as does the present contract. My Brother Dyer's distinction is that the Twenty Grand contract does not "relieve the tug owner or the towboat of its liability to the barge owner as the result of the towboat's negligence," since the barge could sue the tower if the insurer fails to pay.

I believe this distinction is sound. It is not simply one between situations where the tower remains liable and upon the happening of certain contingencies will have to pay and situations in which the tower has attempted to completely eliminate his liability. The contract in *Crescent Towing* related to third party claims, and the tower's liability to third parties could not be affected by an agreement between the tower and the barge—if the barge or its insurers failed to pay, the third party could go against the negligent tower. Rather the distinction is between contracts by which the barge agrees to assume liability for the towboat's negligence and contracts by which the barge simply agrees to provide an insurer to protect the towboat from some of the financial consequences of liability. In *Crescent Towing* the barge agreed to indemnify the tower against the tower's own negligence and coupled that agreement with a commitment to procure insurance assuring the barge's ability to do so. In the instant case the barge agreed to procure insurance naming the tower as an assured and thereby to provide a third party, the insurer, who would protect the tower from the consequences of its own negligence. The difference between the two cases may initially appear slight, but it is functionally important.

In agreements of the *Crescent Towing* type, where the barge acts as the indemnitor and procures insurance primarily to protect itself, it is possible that the barge's agreement to indemnify may be more inclusive than the insurance coverage which the barge agrees to procure and that, consequently, the barge will be liable for damages in excess of the insurance coverage or even for the entire amount if the insurer is defunct or will not pay. The risk that barge owners might accept *Crescent Towing*-type clauses in the erroneous belief that they are accepting only the responsibility for procuring insurance may perhaps justify applying *Bisso* to void such agreements. But in the present agreement this risk is absent, because the responsibility for any liability beyond the insurance which West India Carriers contracted to procure remains on Twenty Grand, the tower. Thus to the extent that one of the *Bisso* rule's functions is to protect the barge owner, the rule plays a part in *Crescent Towing* which it cannot play here.

Beyond protecting barge owners, *Bisso* contains a second avowed policy prong, "to discourage negligence by making wrongdoers pay damages." Neither *Bisso* nor *Crescent Towing*, dealing as they did with situations in which a barge rather than a third party insurer had agreed to be the indemnitor, addresses the issue of the impact of liability insurance upon this analysis. The *Bisso* statement does not and never has meant literally what it says. If it did then *Bisso* would bar the tower from avoiding responsibility for paying damages from his own pocket through the means of purchasing his own liability insurance. Although for a time in the early decades of this century judges in some dry land jurisdictions were inclined toward invalidating liability insurance contracts as contrary to public policy,[3] we have long since decided that

---

3. See, e. g., Coffman v. Louisville & N. R. Co., 184 Ala. 474, 63 So. 527 (1913); Employers' Liability Assur. Corp., Ltd. v. Kelly-Atkinson Const. Co., 182 Ill.App. 372

the benefits afforded by the availability of such insurance outweigh whatever weakening of the deterrent impact of negligence law may flow from that availability. The discouraging of negligence to which *Bisso* refers must, therefore, relate in the present case to the incentive to careful operation provided by the threat of increased insurance premiums which would result from careless operation, and it is relevant to inquire whether the contract in issue will significantly reduce that incentive. I believe that it does not. Barge owners, when confronted with proposed towage contracts under which they agree to procure insurance protecting the tower, will consider how much that insurance will cost and will take the cost into account in selecting a tower. Whether by purchase of a special policy or extension of the barge owner's existing policy to a tower (as appears to be the case here) the barge owner can anticipate that sooner or later his pigeons will come home to roost. If he furnishes insurance to careless towers, he can expect an ultimate, if not an immediate impact upon his premium rates. Absent monopoly in the towers' market, barge owners will have a choice of towers, and, other things being equal, they will avoid the tower who is a bad negligence risk, and competition among towers will provide the incentive for safe operation that would be provided by the threat of increased premiums to the tower itself.

Additionally, to find this contract invalid as against a public policy of discouraging negligence would, for no apparent reason, be a result at odds with the analysis employed in similar cases where shippers extend to carriers the benefit of the shippers' insurance on goods shipped. In Great Lakes Transit Corp. v. Interstate S.S. Co., 301 U.S. 646, 57 S.Ct. 915, 81 L.Ed. 1318 (1937), the court had before it an insurance contract by which a shipowner had insured against damage to cargo which it carried as a common carrier. The cost of the insurance was included in the rate charged shippers. Through the negligence of the shipowner, cargo was damaged. The insurance company paid the shippers and thereafter sought to recover part of its payment from the shipowner on the theory that even though the insurance named the shipowner as an assured, the insurance was ultimately paid for by and for the benefit of the shippers and, therefore, the insurer was subrogated to the rights of the shippers against the carrier. The court rejected this argument noting,

> The underwriters seek to sustain the decree by invoking the doctrine of subrogation, but the equity of subrogation invests the underwriters with the rights of the assured against third persons [citations omitted], not with a right to override its own obligation to the assured. Thus, when a bill of lading provides that in a case of loss the carrier, if liable therefor, shall have the full benefit of any insurance effected upon the goods, the provision limits the right of subrogation of the insurer, upon payment to the shipper, to recover over against the carrier. [Citations omitted.] Such a clause giving the carrier the benefit of insurance effected by the shipper is valid "because the carrier might himself have insured against the loss, even though occasioned by his own negligence; and if a shipper under a bill of lading containing this provision effects insurance and is paid the full amount of his loss, neither he nor the insurer can recover against the carrier." Luckenbach v. W. J. McCahan Sugar Ref. Co., 248 U.S. 139, 146, 39 S.Ct. 53, 54, 63 L.Ed. 170, 174, 1 A.L.R. 1522.

301 U.S. at 654, 57 S.Ct. at 918, 81 L.Ed. at 1323–1324. The instant case ap-

---

(1913); Aetna Life Ins. Co. v. Weck, 163 Ky. 37, 173 S.W. 317 (1915); Standard Life & Acc. Ins. Co. v. Bambrick Bros. Const. Co., 163 Mo.App. 504, 143 S.W. 845 (1912);

In re Aldrich, 86 Vt. 531, 86 A. 801 (1913). See generally, W. Prosser, Handbook of the Law of Torts 542–543 (4th Ed. 1971).

pears to present a similar situation. The barge was to procure insurance and extend the benefit of that insurance to the towboat by having the tug and its owner named as an additional assured and by obtaining a waiver of subrogation from the barge's insurer. Had it done so and had the insurer then sought recovery against the towboat on the theory that such an extension of insurance benefits was invalid under *Bisso*, I believe that we could properly refuse to allow recovery on the strength of the analogy to a shipper's extending the benefits of his cargo insurance to a water carrier. Indeed, we have previously refused to allow a cargo insurer to obtain recovery from a towboat where, pursuant to a contract with the towboat, a cargo owner obtained cargo insurance containing a waiver of subrogation. Fluor Western, Inc., v. G & H Offshore Towing Co., 447 F.2d 35 (C.A.5, 1971). I find no reason to treat the instant case as distinctive because it involves damage to a barge rather than damage to cargo. Nor do I believe that this barge or its insurer should be rewarded because the barge failed to perform its contractual obligation.

In *Crescent Towing*, Justice Harlan, while expressing his conviction that *Bisso* was wrongly decided, cautioned against the hazard of creating indeterminate exceptions to the *Bisso* rule. Certainty in rules of law governing commercial transactions is clearly desirable. Our decision in this case is consistent with that goal. If pushed to extremes, the deterring negligence rationale of *Bisso* would demand that towers be barred from insuring themselves against negligence at all. But *Bisso* has never been so interpreted, and the question, therefore, is not whether to draw a line at all but where to draw it. I believe that the line can, consistent with reason, precedent, and existing business practices, be drawn between valid agreements, such as the one here, which operate purely to allocate the responsibility for obtaining insurance, and agreements, such as the one condemned in *Crescent Towing*, which go further and seek to shift to the barge the primary responsibility for damage not covered by insurance.