### Dr. Wen Ho LEE, Plaintiff,

### v.

### UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.

### No. CIV.A. 99–3380(TPJ).

United States District Court,
District of Columbia.

Oct. 9, 2003.

---

Thomas Charles Green, Charles Kevin Marshall, Sidley Austin Brown & Wood, Washington, DC, Heather E. Hersh, Brian A. Sun, Luan K. Phan, O'Neill, Lysaght & Sunn LLP, Santa Monica, CA, for Wen Ho Lee, plaintiff.

Richard G. Phillips, Jr, U.S. Department of Justice, Anthony Joseph Coppolino, U.S. Department of Justice, Civil Division, Federal Programs Branch, Anne L. Weismann, U.S. Department of Justice, Civil Division, Elizabeth Jane Shapiro, U.S. Department of Justice, Civil Division, Federal Programs Branch, Marcia N. Tiersky, U.S. Department of Justice, Washington, DC, for U.S. Department of Justice, Federal Bureau of Investigation, Department of Energy, John Doe/Jane Doe, 1 through 99, defendants.

## MEMORANDUM & ORDER

JACKSON, District Judge.

According to his second amended complaint, plaintiff Wen Ho Lee is an ethnic Chinese, born in Taiwan, who holds a doctoral degree in mechanical engineering from the University of Texas. He immigrated to the United States in 1969 and became a naturalized U.S. citizen in 1974. Since 1978 Dr. Lee has worked at Los Alamos National Laboratory in New Mexico on the design of U.S. nuclear weapons systems. Until recently he possessed a security clearance at the highest level.

In 1995 U.S. intelligence and law enforcement authorities began to suspect that the Peoples' Republic of China had acquired secret American nuclear technology. The U.S. government commenced investigations which for many months focused on Dr. Lee as a primary suspect. Before the investigations ended with respect to Dr. Lee, much personal information about him which had not previously been public appeared in the news media, coupled with intimations of his disloyalty to the U.S. and suspicions of his complicity in espionage.

By his complaint in this case Dr. Lee sues the United States Departments of Justice and Energy ("DOJ" and "DOE" respectively) and the Federal Bureau of Investigation ("FBI") for money damages for their alleged violations of his rights under the Privacy Act of 1974, 5 U.S.C. § 552a (2000). Specifically, plaintiff alleges that in connection with their investigations of suspected espionage at Los Alamos National Laboratory and a simultaneous public relations campaign to ameliorate damaging publicity about security lapses, the defendant agencies disclosed information pertaining to Dr. Lee by name, without obtaining his consent or assuring its accuracy, to persons not authorized to receive it, namely, the news

media. As a direct and proximate result, he alleges, he has suffered adverse effects, including financial loss, injury to his reputation, and extreme physical and emotional distress.

This case has been pending for over three years while the plaintiff has actively pursued pretrial discovery. Trial preparations have concluded and the case is ready for trial with the exception of the matter presently before the Court. Having been unsuccessful to date in developing definitive proof that defendants were the source of the myriad news reports about him, Dr. Lee has issued subpoenas *duces tecum* for the depositions of five journalists known to be the authors of published articles containing the information about him allegedly disclosed unlawfully by defendants. The journalists have responded with motions to quash the subpoenas on the ground of the so-called "reporter's privilege" to, *inter alia*, refuse to reveal confidential news sources.[1]

### I.

 The journalists first invoke a provision of local statutory law known as the District of Columbia Shield Law, D.C.Code Ann. §§ 16–4701–4703 (2001), as authority for precluding their testimony and document production altogether. That statute prohibits compulsory disclosure of "the source of any news or information" procured by a journalist "acting in an official news gathering capacity." D.C.Code Ann. § 16–4702(1).

Whatever may be its force in the context of a civil common law action in a court of the District of Columbia, *see Grunseth v. Marriott Corp.,* 868 F.Supp. 333, 336

(D.D.C.1994), the D.C. statute is inapplicable here. Congress has never enacted a federal counterpart to the D.C. Shield Law, and plaintiff's sole cause of action in this case is predicated upon a federal statute creating both the defendants' duty to act and the plaintiff's private right to enforce it in a federal district court. Evidentiary privileges in cases arising under federal substantive law in federal court are governed exclusively by the federal law of privilege. *See* Fed.R.Evid. 501.

### II.

 The Unites States Supreme Court first considered the possibility of a constitutionally based reporter's privilege over 30 years ago in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *Branzburg* presented a cluster of cases in which a newspaper had published news stories describing criminal conduct actually witnessed by a reporter who refused to testify about the experience when summoned before a grand jury. Each reporter claimed a First Amendment "privilege" to decline to reveal news sources in the interest of protecting the press' ability to acquire information freely, particularly when a source had been promised that his or her identity would not be revealed.

Observing that Congress had considered but had yet to enact such a privilege into law,[2] the Supreme Court expressly and resoundingly declined to recognize such a privilege on its own. *See Branzburg,* 408 U.S. at 707, 92 S.Ct. 2646. The *Branzburg* Court did, however, acknowledge that "news gathering is not without is First Amendment protections," *id.,* and left to lower courts the task of deciding in indi-

---

1. The journalists are James Risen and Jeff Gerth of *The New York Times;* Robert Drogin of *The Los Angeles Times;* Josef Hebert of the Associated Press; and Pierre Thomas of the Cable News Network ("CNN").

2. Nor has Congress enacted such a law in the 30–plus years since *Branzburg* was decided.

vidual cases when the interests of justice trumped a reporter's reasons for withholding information to protect news sources when summoned to testify.

The Supreme Court has not directly revisited the issue since *Branzburg*,[3] and while a host of lower court cases in other circuits (and a number of district court cases in the District of Columbia) have done so, the D.C. Circuit has, surprisingly, had occasion only twice to define the scope of First Amendment protections afforded confidential news sources against compulsory disclosure.

The first D.C. Circuit case was *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.) *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974), which affirmed an order of the district court compelling a defendant newspaper reporter to answer questions on deposition in a civil libel suit to identify the "eyewitness" sources upon which his allegedly libelous statements in print were based. Although *Branzburg* had only dealt with a reporter's compulsory testimony before a criminal grand jury, the D.C. Circuit held "on the basis of both authority and reason" that civil litigation as well "has its entitlements on proper occasion to the pursuit of truth wherever it may be found." *Carey*, 492 F.2d at 632. The D.C. Circuit went on to conclude that in both civil and criminal litigation a reporter's "asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony[.]" *Id.* at 636 (quoting Powell, J. concurring, in *Branzburg*, 408 U.S. at 710, 92 S.Ct. 2646).

Seven years later the D.C. Circuit apparently read *Branzburg* as actually recognizing a limited privilege upon which a reporter might withhold testimony on First Amendment grounds if it would compromise a confidential news source. In *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir. 1981), the court of appeals struck the balance as directed by *Carey* to uphold the assertion of what has come to be known as the reporter's "qualified privilege" in a civil Privacy Act case such as this. The *Zerilli* plaintiffs brought suit against the government for allegedly disclosing to a newspaper the contents of electronic surveillance logs which implicated the plaintiffs in criminal conduct. The newspaper published the material, and the *Zerilli* plaintiffs sought to compel the reporter to disclose his sources.

Giving primacy to the "preferred position of the First Amendment and the importance of a vigorous press[,]" the *Zerilli* court asserted that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." 656 F.2d at 712. However, if the information sought is "of central importance" to the civil litigant's case (as it had been in *Carey*) reporters may be compelled to disclose their sources, but "only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Id.* at 713.

The information sought by the *Zerilli* plaintiffs, *viz.*, whether government agents as opposed to third parties had leaked the surveillance logs to the reporter, was "crucial to their case," the *Zerilli* court said. *Id.* at 714. However, plaintiffs had "clearly ... not fulfilled their obligation to ex-

---

**3.** The Supreme Court did, however, unanimously reaffirm the *Branzburg* principle in 1990 to reject a claim of First Amendment privilege for academic-tenure "peer review" materials subpoenaed in connection with em-ployment discrimination litigation and resisted on "academic freedom" grounds. *See Univ. of Pa. v. EEOC*, 493 U.S. 182, 201, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

haust possible alternative sources of [the same] information." *Id.* In prior discovery provided to the plaintiffs in *Zerilli* the government asserted that its own internal investigations had been unable to identify any government employee as a source of the surveillance logs in the newspaper's possession. *Id.* It did, however, disclose the names of four DOJ employees who had "knowledge" of the logs, but no depositions of the Justice Department employees were ever taken, the plaintiffs simply accepting at face value the government's representation that it "would be time-consuming, costly, and unproductive." *Id.* at 714–15.

*Branzburg v. Hayes* was decided in 1972, and the D.C. Circuit decided *Carey v. Hume* in 1974 and *Zerilli v. Smith* in 1981. Neither court has directly addressed the matter of a qualified reporter's privilege since. Those three cases therefore represent the controlling D.C. Circuit law and govern the disposition of the journalists' motions presently before this Court.

### III.

With exceptions not relevant here, the Privacy Act states in pertinent part: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains. . . ." 5 U.S.C. § 552a(b).[4] The Act also imposes a duty upon every agency to maintain all records it uses in making any determination about any individual with such accuracy, relevance, time-liness and completeness as is reasonably necessary to assure fairness to the individual in the determination, *id.* § 552a(e)(5), and to make reasonable efforts to assure that they have been so maintained before making any dissemination thereof to others. *Id.,* § 552a(e)(6).

Finally, the Act creates a civil cause of action in favor of any individual adversely affected by an agency's intentional or willful violation of its provisions. *Id.,* § 552(g)(1). It also imposes criminal penalties upon agency officers or employees who willfully disclose information covered by the Act without the prior consent of an individual to whom it pertains. *Id.,* § 552a(i)(1).

### The Centrality of the Information Sought to Plaintiff's Case

Plaintiff alleges that, beginning in 1995, defendants commenced their several investigations into the possibility that classified U.S. nuclear technology had come into the possession of the Peoples' Republic of China, and in due course the investigations gave defendants reason to believe that Dr. Lee may have been the culprit. In March, 1999, in an article by journalists James Risen and Jeff Gerth, *The New York Times* broke the story of the investigations and publicly identified Dr. Lee as a suspect, giving information about his employment history, personal financial situation, and purported results of his polygraph examinations. Further press coverage followed, which, according to plaintiff, ultimately contributed to the loss of his job, his security clearance, and his professional

---

**4.** The exceptions are not relevant because none of them include disclosures to representatives of the news media.

The term "record" is defined as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph. . . ." 5 U.S.C. § 552a(a)(4).

reputation. It also led to his indictment on criminal charges, a period of pretrial incarceration, and caused him acute humiliation and embarrassment at being publicly branded a disloyal American citizen and a spy.

Dr. Lee blames defendants for disclosing the details of their investigations, including the personal information specific to him, to the news media which published it, with or without verification. That information, according to Dr. Lee, was all contained in the "records" amassed by defendants in the course of their investigations, and he never consented to its disclosure. To the extent it implied he was guilty of treason, it was also inaccurate.

Defendants have never admitted to being the sources of the news stories. To prevail at trial, therefore, plaintiff must perforce prove that they were, and that third parties unconnected with defendants (but coincidentally in possession of the same information) were not the informants. The journalists' sources are thus "of central importance ... go[ing] 'to the heart of the matter' ... and [are] crucial to" Dr. Lee's case; "[t]he argument in favor of compelled disclosure is [thus] relatively strong." *Zerilli*, 656 F.2d at 713 (quoting *Carey*, 492 F.2d at 636).

*Plaintiff's Exhaustion of Alternative Sources of Evidence*

Unlike the indolent plaintiffs in *Zerilli*, Dr. Lee has been diligently pursuing direct proof that officers or employees of one or more defendant agencies were the original disseminators of the information about him to the news media.[5]

The record discloses that numerous people elsewhere in the government to whom disclosure was arguably appropriate, including members of Congress and congressional staff, were made privy to details of the investigations and Dr. Lee's connection to them. Were any of them shown to be the sources for the news stories no liability would attach to the government, even if the information originated with defendants. Furthermore, once information is in the public domain, news stories tend to become sources for still more news stories. Only if Dr. Lee can ascribe responsibility to defendants for imparting information about him directly to the journalists who published it can he prevail at trial. And at present it appears that only defendants and the journalists know for sure.

There are five principal tactical devices available to a plaintiff under the Federal Rules of Civil Procedure to extract evidence from reticent defendants. It appears Dr. Lee has availed himself of all of them.

First, a plaintiff can look to defendants' answers to the factual allegations of his complaint to see if any are conceded. Dr. Lee's second amended complaint makes multiple allegations accusing defendants of leaking personal information about him to the press in relation to specific news stories. Defendants' "eighth [and last] af-

---

5. From the outset, plaintiff submits, his discovery of the defendants has been complicated by three factors not ordinarily encountered in civil litigation of any description. First, the subject matter has in many cases been classified, relating as it does to matters of national security. Second, the government itself has purportedly been conducting its own simultaneous investigation into "leaks" of classified information (as well as its investigations of the possible compromise of U.S. nu-clear technology), and has, at numerous junctures in the course of discovery, asserted a law enforcement privilege to block plaintiff's access to relevant information. Third, although no one has yet reportedly invoked a privilege against self-incrimination, the possibility that disclosure of certain information might have entailed criminal liability has not been conducive to candor on the part of witnesses who have been deposed.

firmative defense[,]" the only defense responding specifically to the factual allegations of the complaint, is simply a litany of denials and disclaimers of knowledge or information sufficient to form a belief. Nowhere does the answer respond in such a fashion as to constitute a judicial admission that any defendant disclosed any information covered by the Privacy Act to anyone not authorized to receive it.

In Paragraph 17 of his second amended complaint, for example, plaintiff alleged that reporters James Risen and Jeff Gerth of *The New York Times* broke the story on March 6, 1999, detailing information about the "primary suspect" that revealed him to be Dr. Lee. Paragraph 18 charged that the story was based on illegal leaks of private information collected and maintained by defendants. Defendants' responses to Paragraphs 17 and 18 denies that they were the sources of the "investigative information" appearing in the *Times'* article of March 6th, and they are otherwise without knowledge or information to admit or deny.

Second, a plaintiff can request defendants to produce documents pursuant to Fed.R.Civ.P. 34. The record in this case reflects that plaintiff has made a total of six document requests of defendants. Responsive documents began to be received by plaintiff's counsel in June, 2001, and were continuing to arrive, as rapidly as defendants were able to declassify them, as recently as June of 2003. They are apparently inconclusive.

Third, a plaintiff can submit interrogatories to defendants pursuant to Fed. R.Civ.P. 33. In January, 2001, plaintiff propounded his first set of interrogatories to defendants. The responses, received in May, 2001, interposed six pages of "objections" to them (including being "overbroad, oppressive, duplicative [and] an undue burden and expense", i.e., there were too many people defendants would have to make inquiry of to make a definitive answer). The information was also said to be privileged in multiple respects. Asked, for example, to identify persons who "communicated with James Risen of *The New York Times* regarding Wen Ho Lee," the defendants answered, subject to objections, only with the name of a DOE official already known to plaintiff who had appeared on "60 Minutes." [6]

Fourth, a plaintiff can serve requests for admissions pursuant to Fed.R.Civ.P. 36. In December, 2000, Dr. Lee submitted his first of several sets of requests for admissions to defendants. The last response to his final (the fourth) set of requests was answered in November, 2002. Request for Admission No. 21 to DOE (of the second set) is typical: "Admit that [Secretary of Energy] Richardson provided Wen Ho Lee's name to James Risen of the *The New York Times* in connection with purported Chinese spy scandal coverage." Also typical is DOE's Response: "DOE responds that it has made reasonable inquiry and that information known or readily obtainable is insufficient for DOE to admit or deny the truth of the requested information." [7]

Fifth, a plaintiff can depose witnesses who may have relevant knowledge pursuant to Fed.R.Civ.P. 30, and in conjunction therewith require production of documents, by notice to a party, *see* Fed. R.Civ.P. 30(b)(5) or subpoena *duces tecum* to a non-party witness, *see* Fed.R.Civ.P. 30(b)(1).

---

**6.** That person, one Notra Trulock, was later deposed and denied that he had first alerted Risen to the significance of Dr. Lee.

**7.** Secretary Richardson was deposed as well. He could not recall speaking to Risen.

Having learned from the example of the unsuccessful plaintiffs in *Zerilli* who took no depositions at all, Dr. Lee has made extensive use of Rule 30 depositions. After appropriately awaiting defendants' answers to interrogatories and document production to identify likely knowledgeable deponents, he has to date taken a total of 20 depositions of officers or agents of the defendants,[8] and one deposition of an unprotesting journalist. The deposition transcripts generally reveal a pattern of denials, vague or evasive answers, and stonewalling. None of the deponents, plaintiff says, has admitted to having personal knowledge of the source of any disclosures. (Pl.'s Opp'n to Mot. to Quash at 29). Thus, in the absence of the serendipitous, last-minute appearance of a willing independent witness with personal knowledge of the facts, at the moment only the journalists can testify as to whether defendants were the sources for the various news stories.

Again focusing on the seminal story in *The New York Times* of March 6, 1999, relevant examples of the testimony elicited from deponents identified with defendants are set forth below:

- Brooke Anderson, DOE's Director of Public Affairs, recalled speaking to Risen and/or Gerth prior to the March 6, 1999, article. According to Anderson, the reporters already possessed a "great deal of information," didn't divulge any of their sources to her, and got no confirmation or comment from her. (Anderson Dep. at 32–34).

- John Collingwood, head of the FBI's Office of Public and Congressional Affairs, spoke to someone from *The New York Times*—he does not remember who—shortly before the article appeared. The caller told him what was about to be published, but he did not recall being told where the information came from, nor whether he confirmed anything he was told. (Collingwood Dep. at 88–104).

- Carol Covert, FBI's lead case agent, never directly spoke to any journalists personally (Covert Dep. at 61) and can't recall anyone ever discussing unauthorized disclosures of information to *The New York Times* in her presence. (*Id.* at 270).

- Edward Curran, an FBI civilian employee, formerly a Special Agent, detailed to DOE as a counter-intelligence specialist, admitted speaking to the media from time to time, including Messrs. Risen and Gerth (Curran Dep. at 91) but denied having imparted information contained in the March 6th article to them himself and denied knowing who had done so. (*Id.* at 198–200).

- William Richardson, Secretary of Energy, who does not recall if he spoke to Messrs. Risen and Gerth prior to the March 6th article (Richardson Dep. at 199) and would not otherwise speculate on who their sources might have been. (*Id.* at 191).

- Notra Trulock, DOE's Acting Deputy Director for Intelligence Activities (mentioned by many people as *The New York Times*' most likely principal

---

8. Among the deponents from the DOE were the Secretary, two former heads of intelligence and counterintelligence who were in charge of its investigations, and DOE's general counsel. DOJ deponents included its lead press officer, the acting chief of internal security, the head of DOJ's prosecution team, and the U.S. Attorney for the District of New Mexico. The Director of the FBI, his chief of staff, and the principal special agent assigned to its investigation were also deposed.

source) acknowledged having spoken to Mr. Risen, but asserted that Risen already knew about the investigation and its chief suspect. Trulock says he refused to confirm Risen's information, and in any event professed only to have talked to him about "counter-intelligence reform issues." (Trulock Dep. at 168–175).

## IV.

The journalists insist that *Zerilli's* exhaustion-of-alternative-sources requirement must be read as a literal absolute: Not until plaintiff has tried and failed to persuade the Court to breach the law enforcement privilege (including grand jury secrecy), and has unsuccessfully sought to be given judicial access to classified material, can he claim to have exhausted the defendants themselves as alternatives to the journalists' testimony. Even then, the journalists argue, he should be required to give notice of Rule 30(b)(6) depositions of each defendant, notwithstanding that defendants have already institutionally denied possessing any disclosable relevant knowledge. Finally, they say, plaintiff has been provided with other "names" as discovery has progressed; they, too, should all be deposed, whether or not there is any reason at all to believe them to be possessed of relevant knowledge. The names include dozens, if not hundreds, of individuals on congressional staffs, in the White House, and on special commissions whose depositions would offer minimal likelihood of further illumination. (*See, e.g.,* Trulock Dep. at 184; Richardson Dep. at 165–67; Kelly Dep. at 65–66).

A plaintiff is not obliged to carry out a "wide-ranging and onerous discovery burden[ ] where the path is . . . ill-lighted." *Carey,* 492 F.2d at 639. The Court reminds the journalists that the *Zerilli* exhaustion-of-alternative-sources factor requires only that all "reasonable" sources of evidence be tapped. *Zerilli,* 656 F.2d at 713. It does not require proof positive that the knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants.

Moreover, the Court has some doubt that a truly worthy First Amendment interest resides in protecting the identity of government personnel who disclose to the press information that the Privacy Act says they may not reveal. Despite the D.C. Circuit's eloquent rendering of the rationale underlying the notion of a reporter's "qualified privilege" in *Zerilli,*[9] many of the Supreme Court's countervailing considerations casting doubt upon its wisdom in *Branzburg* are as valid today as they were when *Branzburg* was decided, and some are particularly apposite to this case.

For example, writing for the majority in *Branzburg,* Justice White said: "It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." 408 U.S. at 682, 92 S.Ct. 2646. Plaintiff's depositions of these journalists would certainly be in aid of enforcement of a federal statute of general applicability, affording every individual the right to insist that his government not disseminate private information—especial-

---

9. "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." *Zerilli,* 656 F.2d at 711.

ly derogatory information—about him to the world.

Justice White also said: "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 684, 92 S.Ct. 2646. Information subject to the Privacy Act is *ipso facto* not available to the public generally; consequently a reporter who possesses such information does so without right, whether or not he came by it unlawfully.

The journalists under subpoena make much of the fact that they have promised their sources anonymity; they have pledged to keep their identities confidential. Of such sources Justice White had this to say:

> The preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection. It would be frivolous to assert-and no one does in these cases-that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through repre-

hensible conduct forbidden to all other persons.

. . . . .

> Thus, we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no substantial question. The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not.

*Branzburg,* 408 U.S. at 691–92, 92 S.Ct. 2646.

It does not detract from the importance of the First Amendment principle at stake to conclude that, in the instant case at least, the reasons for concealing from the plaintiff possible governmental complicity (if such there were) in the revelation to the news media of private, personal, and acutely hurtful information about Dr. Lee do not outweigh Dr. Lee's interest in having the evidence available for his use at trial. The Court will deny the motions to quash in part and enforce them in part, in accordance with the following Order, and it is, therefore, this 9th day of October, 2003,

ORDERED, that the motions to quash the respective subpoenas *duces tecum* of James Risen, Jeff Gerth, Bob Drogin, Josef Hebert, and Pierre Thomas are denied in part; and it is

FURTHER ORDERED, that beginning with the deposition of James Risen, the journalists shall appear at times to be appointed for their depositions upon oral ex-

amination by plaintiff's attorneys pursuant to Fed.R.Civ.P. 30; and it is

FURTHER ORDERED, that upon the occasion of their depositions aforesaid, the journalists shall, if asked, truthfully answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information to them directly about Wen Ho Lee, and as to the nature of the information so provided; and it is

FURTHER ORDERED, that upon the occasion of their depositions aforesaid, the journalists shall produce all "records" as that term is defined in 5 U.S.C. § 552a(a)(4) provided to them directly by an officer or agent of defendants, or any of them; and it is

FURTHER ORDERED, that upon request of any party or deponent, the depositions aforesaid shall be taken before the Court, to enable objections or requests for protective orders to be promptly entertained, and / or shall be placed under seal pending further order of the Court upon showing of good cause to unseal them.